**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
.................................................................X

ALEXANDROS PERROS, THOMAS DELLE,
NICHOLAS LENOCI AND VICTOR
PATALANO, Collectively on Behalf of All
Persons Similarly Situated and/or Sheriff's
Department Former Personnel Unfairly Denied
Proper "Recommendation For Consideration Of
Application For Pistol License For Retiring Peace
[Police] Officer" Forms and/or "Good Guy
Letters" Following Retirement, Due To Injury and
or Disability,

                                    Plaintiffs,

        -against-

COUNTY OF NASSAU and MICHAEL
SPOSATO, in his Individual and Official
Capacities,

                                    Defendants.

.................................................................X

FILED
CLERK

9/3/2025 12:02 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM &**
**ORDER FOLLOWING**
**INQUEST ON**
**DAMAGES**

15-CV-5598 (GRB)

**GARY R. BROWN, United States District Judge**:

> *"I do solemnly swear that I will support the Constitution of the United States, and the Constitution of the State of New York, and that I will faithfully discharge the duties of the office of the Sheriff of Nassau County, according to the best of my ability."*
>
> -Oath required by the *Constitution of the State of New York*, Article XIII, Section 1.

Thomas Jefferson once characterized "the office of sheriff [as] the most important as of all the executive offices of the country."[1]  In the lore of the Old West, the sheriff stands as an honorable figure who brought order to a lawless region.  This perception endured.  In *High Noon* (1952), Gary Cooper portrays a lawman who, though abandoned by his community, is driven by

---

[1]*The Best Letters of Thomas Jefferson*, Houghton Mifflin Company (1926) at 214.

integrity to risk everything to battle lawlessness.  In modern parlance, the idiom "There's a new sheriff in town" denotes the arrival of a leader who will enforce rules that have been neglected.

Particularly when set against this illustrious history, the testimony of and actions by the individual defendant in this case – Michael Sposato, former Sheriff of Nassau County – prove disgraceful.

In this action, a group of former Nassau County corrections officers and a deputy sheriff alleged that Sposato, then Nassau County Sheriff, withheld recommendations to which they were entitled, preventing them from obtaining firearms permits solely on the basis of disabilities resulting from on-the-job injuries.  Defendants Sposato and the County conceded liability, and all parties consented to an inquest on damages before this Court, waiving consideration by a jury. Over the course of a week, this Court heard testimony from five former corrections officers and one deputy, Sposato and an attorney for the County with expertise in handgun permit procedure. The story that unfolded was extraordinary, as Sposato's intentional, thoughtless actions had significant consequences for the plaintiffs.

For the reasons that follow, the Court hereby awards $283,000 in damages to plaintiffs, consisting of $133,000 in compensatory damages awarded jointly against Sposato and Nassau County, and $150,000 in punitive damages awarded solely against Sposato, to be divided in the manner set forth herein.[2]

**Background**

Plaintiffs filed this action in 2015, seeking recompense for the failure of Sposato to issue handgun permit recommendations – usually referred to "good guy" letters – after retiring from

---

[2] As discussed *infra*, notwithstanding its legal immunity from punitive damages and in seeming contravention of New York public policy, Nassau County has agreed to indemnify Sposato as to both compensatory and punitive damages.

the Sheriff's Department due to disabilities arising from workplace injuries. Following a decision by the Honorable Leonard D. Wexler in 2017, several causes of action were dismissed, leaving solely claims under the Equal Protection Clause and for municipal liability under *Monell*. DE 52. In or around 2018, following Sposato's ouster, a new sheriff issued the "good guy" letters for the six plaintiffs. After the completion of discovery in this matter, defendants conceded liability. Electronic Order dated January 3, 2024. Following multiple efforts to settle the case, the Court set an inquest which was completed over the course of four days.

**Facts**

At the inquest, the Court heard testimony from eight witnesses, and received numerous documentary exhibits into evidence, all of which established the following:

Upon retirement of one of its officers or deputies, members of the Sheriff's Department prepared a form inconveniently entitled "Recommendation for Consideration of Application for Pistol License for Retiring Peace/Police Officer." *See, e.g.,* Plaintiff's Exhibit 1. The form contained sections for information provided by five different units of the Sheriff's Department, concluding with a section to be completed by the Sheriff. The Sheriff was presented with a binary choice: "Recommend Consideration of License Application" or "Do Not Recommend Consideration of License Application." *Id.* Thanks in part to its cumbersome title, these forms are commonly known as "good guy letters." The moniker seems, at first glance, to be a misnomer as, all things being equal, the recommendation form could reflect approval or disapproval. However, the wide adoption of "good guy letters" appears a linguistic recognition that these recommendations are routinely and universally granted; the refusal to make the recommendation is so uncommon that there is no corresponding phrase in the police lexicon.

3

That all changed when defendant Sposato became Sheriff.  While the record contains repeated references to a "change in policy," no written policy could be identified, and the parameters of the unwritten policy are absent from the record.  Rather, it appears that Sposato harbored animus toward deputy sheriffs and officers who retired following an on-the-job injury, entitling them to an enhanced pension, and began routinely denying the issuance of handgun permit recommendations.  These defendants were without recommendations, and the concomitant pistol permits, until a new sheriff took the reins in 2018 and issued the letters for them.  Tr. 228.

The issuance of a "good guy letter" was a retirement benefit upon which other benefits turned.  Upon its issuance, the Nassau County Police Department would issue a Retired Law Enforcement Pistol Permit, which allowed retired deputy sheriffs to carry a pistol throughout Nassau County, and possibly elsewhere.  Tr. 177, 371.  Without it, the retirees would not be permitted to retain their service pistols – one of the benefits to which they were otherwise entitled – and were required to surrender any other handguns in their possession, even if personally owned.  Tr. 328.  Additionally, the Sheriff's Department issued a special set of credentials, in which the retiree's photo was set against a blue background rather than the usual red background used for law enforcement credentials.  Having a blue background identification photo served as a signal to other law enforcement officers as well as those familiar with such matters that the retired officer was not permitted to carry a firearm.  The blue background, viewed by the plaintiffs as a kind of scarlet letter,[3] is visible from a substantial distance, as the undersigned examined one from more than 20 feet away.  Tr. 52.

---

[3] From the 1850 novel by Nathaniel Hawthorne, the scarlet letter was a large red "A" that the protagonist was forced to wear as a sign of shame after committing adultery.  Nathaniel Hawthorne, *The Scarlet Letter* (1850).

4

Assessing credibility became particularly important regarding nearly all the witnesses here.  The evidence offered by each plaintiff was generally limited to his own testimony – no expert testimony or documents were provided to support the damages sought by each plaintiff.  Similarly, the weight and value of Sposato's testimony bears heavily on the determination of punitive damages.  Much, therefore, turned on the credibility and experiences of these witnesses, which must be analyzed separately.

*Plaintiff Alexandros Perros*

Lead plaintiff Alexandros Perros proved a highly persuasive witness.  He had worked as corrections officer for ten years.  Tr. 137.  His service ended when, while intervening on behalf of a hospital staff worker who was being attacked by an incarcerated mental patient, sustaining serious injuries to his back and knee.  Tr. 137-8.  As a result of required surgery, he developed blood clots which caused additional medical problems.  Tr. 139.  He retired on a disability retirement.  Notwithstanding medical evidence provided by the Sheriff's Department Medical Investigations Unit finding that Perros "may retain and safeguard his firearm with no restrictions," defendant Sposato denied Perros a firearms permit recommendation.  Tr. 140-43.

Unaware of the Sheriff's decision, and assuming Sposato had approved the form, Perros brought the recommendation form to the police department, sealed in an envelope.  Tr. 145.  He was surprised to learn from an officer at the Pistol Permit Section that his recommendation had been denied – at first, he believed the officer was joking.  Tr. 145.  He felt "humiliated" and "embarrassed" in front of the officers, several of whom he knew.  Tr. 146.  At that time, Perros held three firearms, two provided by the county and one he owned personally.  Tr. 142.  Directed to surrender his weapons, Perros brought them in.  Tr. 142.

Perros articulated the emotional impact of this situation:

…it was very hurtful because I wore my uniform with honor.  I served my community.  I had commendations in my jacket, and I left there injured in the line of duty and treated like a doormat on the way out. [ ]

That letter is an attestation of your character.  It sums up your career.  It's not only for a pistol permit.  It attests to who you are and your moral character. [ ] [I]t holds a lot of weight in the law enforcement community.

Tr. 146, 151.  He testified to having encounters with peers, who questioned him about the reasons why he was denied a recommendation, and inquiring what he was hiding.  Tr. 151. Perros's wife, also employed as a corrections officer, had similar encounters at work, which she shared with Perros.  Tr. 155.  Perros explained that the retirement identification with a blue background suggests that the officer "did something wrong. [ ] Either he messed up at work, he got into a bad shooting or he did something that wasn't right, and that's part of the …punishment."  Tr. 153.  He also described a situation in which he was pulled over for speeding out of state.  Seeing that he was carrying an identification with a blue background photograph, the officer accused him of carrying a fake ID.  Tr. 158.

Perros's testimony proved credible in part because of its moderation and accuracy.  He described two instances in which he encountered former inmates during the period when he had been denied a firearms permit.  One was at a nursery, where he was accompanying his children, and was approached by a former inmate with "real big felony charges."  Tr. 156.  Another was an encounter with an inmate he described as "actually pretty friendly."  *Id.*  Perros noted that while "[n]othing big transpired out of them," he still "felt unsafe, unsure of myself."  Tr. 155.

*Nicholas Lenoci*

After 25 years as a corrections officer, plaintiff Lenoci injured his neck, back and hips during a violent confrontation with a visitor to the prison attempting to smuggle contraband into the jail.  Tr. 183.  These injuries required multiple surgeries, including hip replacements.  Tr.

6

184. Unlike other plaintiffs, he was injured by a non-inmate, rendering him ineligible for a three-quarters pay disability retirement. Yet Lenoci's time on the job permitted him to retire pursuant to a regular "service" retirement. Tr. 184. When he learned that the Sheriff had turned down his recommendation for a firearms permit, he felt "mortified" and "hurt." Tr. 185. "I wanted to retire with dignity," he reported, "and I felt that it was taken away from me." *Id.*

Not knowing where to turn, Lenoci called Sposato's office, leaving a message. The two men had become acquainted while working in adjoining offices. Tr. 187. Sposato returned the call. When asked why he did not provide a pistol permit recommendation for Lenoci, Sposato responded "well, you went out three quarters," referring to a disability retirement. Tr. 188. Lenoci responded "no, I didn't sir. I retired under my regular 25-year retirement pay." Tr. 188. Sposato responded "oh, I didn't know that. I will have to look into it. I will get back to you." Tr. 190. Yet he never did. *Id.*

Lenoci related several instances of resultant personal safety issues that were bone-chilling. One involved attending a monster truck show at the Nassau Coliseum with his children. He heard someone behind him call out "hey C.O." and turned around to see three ex-inmates "that [he] had issues with during my criminal investigation career that had problems with other officers and that [he] had prosecuted." Tr. 191. Realizing that he no service revolver with him, Lenoci grew concerned. His trepidation heightened when the three former inmates began singing the Bob Marley song "I Shot the Sheriff." At intermission, Lenoci led his wife and children from the show, leaving early to avoid further confrontation. Tr. 192.

Reticent because of this experience, Lenoci limited his activities to daylight hours. Tr. 194. Sometime later, Lenoci took his wife to a Home Depot location to make some purchases. He spotted another former inmate who "looked right at me and he started to walk fast, almost

7

like charging toward me." Tr. 195.  Lenoci "bladed" himself toward the former inmate, a side stance used by police officers to shift their weapon side away from a confrontation.  *Id.*  "I pointed at him and patted my side like I had a gun," he explained.  Tr. 196.  At this point, the ex-inmate's girlfriend pulled him away.  *Id.*  Reflecting on the experience, Lenoci observed "there are certain times when you really needed to know that you had something that you could protect yourself with, and I didn't."  *Id.*

*Thomas Delle*

Plaintiff Delle, who had been retired for 12 years, and who worked for the Sheriff's Department as a "floater" for a period of years, reported having to retire on a disability pension based on "cumulative" injuries, including a 2004 injury in which he "broke his neck," a 2009 assault by an inmate, and a second assault in 2012 by an inmate.  Tr. 244.  He reported being advised by a doctor that if he "got tackled or knocked over one more time, [he] could be paralyzed."  Tr. 246.  His service revolver had been locked up at the Sheriff's Department on the day he was attacked and disabled, but he maintained five other handguns at home, which had to be surrendered when Sheriff Sposato disapproved his permit recommendation form upon his retirement.  Tr. 254-55.  Four months after the disapproval, a team of sheriff's deputies appeared at his home to collect his personal handguns.  Tr. 257.  Delle, who had a military background, explained that he considered the non-recommendation a slight similar to a dishonorable discharge.  Tr. 265.  He also reported being belittled by other law enforcement officers, including his brother.  Observing his testimony, on balance, it seemed his subjective reporting of the reputational harm and his strong, and sometimes extreme, reactions to that were credible.

Yet there were significant problems with Delle's testimony.  He related an encounter with a pair of former inmates at a Dunkin Donuts location.  Tr. 267.  He stated that at the time of the

incident "my arm [was] still in a sling." Tr. 267. Delle testified he believed that the former

inmates were going to attack him, but then one told the other that "this guy is off duty and he's

carrying a big gun because he's that kind of guy, he was a Marine." Tr. 268. He then added that

he "had nothing. I was out hurt at the time." Tr. 268. In response to a clarifying question from

the Court, he testified that this occurred "[b]efore I retired. When they took my guns." Tr. 268.

On cross-examination, Delle admitted that his arm was temporarily put in a sling as treatment for

an injury in 2009, making it a virtual impossibility that the Dunkin Donuts incident occurred

after his guns were taken in connection with his retirement in 2013. Tr. 280-81. Another

encounter with an inmate at Ace Hardware described by Delle was also temporally undercut by

the presence of the sling. Tr. 286.

     In discussing the personal impact of the denial, Delle related an incident in which he

showed his retirement ID with a blue background at a car wash to get a first responders discount.

Tr. 272. Delle testified that a woman working at the car wash accused him of showing a fake ID

and made a scene. Tr. 273. The lack of detail makes this claim farfetched. Delle also provided

an account, which he characterized as "important," of a purported encounter with a former

inmate named Slater which he tried to portray as a threatening incident that led him to avoid

returning to Queens while he was without a handgun permit. Tr. 275-76. However, his account

was undermined by the fact that he was eating with a friend who was an armed, active-duty

detective. Tr. 276.

     His testimony about several other purported encounters with individuals he subjectively

believed to be gang members were too biased, inconsistent and/or conclusory in nature to credit.

*See, e.g.,* Tr. 269-70 (Ace Hardware incident described as both "after . . . I got . . . my weapons

back" and "[n]o , I didn't have them"); Tr. 271 ("I've pulled into a 7-Eleven and I've seen guys

and I go, oh, not for me, and I back out right and leave"); Tr. 273 ("The Home Depot is a big thing where they steal a lot."). Delle's reporting of safety fears in absence of a firearm was further weakened by his testimony concerning his failure to obtain a long gun for his home. Tr. 266 ("And now I'm at home going, what am I going to do. I was thinking about getting a long gun, you know, but I'm hoping and praying that the chances of them coming to my house is slim.").

*Robert Lanier*

Plaintiff Lanier, an army veteran, worked for more than 22 years as a corrections officer. He was injured in 2007 when a mentally ill inmate slammed his head into a cell door, causing neck injuries. Tr. 308. He returned to work, though limited to light duty, until he retired in 2012. Tr. 310. Lanier was "shocked" when advised that his recommendation form, which he had assumed had been approved, contained a "Do not recommend" endorsement from the Sheriff. Tr. 312.

Unlike the other plaintiffs, who, because of their injuries had not been able to attend qualifying training with their weapons, Lanier attended trainings every year, so the absence of qualification could not have been a basis for disapproval. Tr. 314. Though disaffected with the determination, he surrendered his service weapon – the only firearm he maintained – in August 2012. In October 2012, he sought reconsideration, supported by medical documentation, of the Sheriff's decision. Tr. 319. Sposato signed a letter in response, clarifying that the recommendation form was not issued in error, noting "your ability to possess firearms was restricted as a result of the injury that culminated in your disability retirement." Ex. 5E. In addition, Lanier provided the Sheriff with a letter from a lawyer explaining that he had represented a former inmate who was prosecuted for using a razor to slash the face of Mr.

Lanier's brother – an identical twin – under the belief that he was attacking Mr. Lanier. Tr. 324-25. His brother received 54 stitches in his face. Tr. 326. The lawyer's letter further stated that "it is reasonable to conclude that Mr. Neeley remains a threat to the life of Officer Lanier." Tr. 325.[4] Lanier also engaged an attorney to write a letter appealing Sposato's decision; that request was either rejected or ignored. Tr. 332-334. In a personal conversation with Sposato, Lanier questioned him about the reasons for the denial. "Don't take it personal, it's just business," Sposato replied. Tr. 350.

Of the plaintiffs, Lanier came closest to articulating an employment hurdle created by the disapproval of his firearms permit application: he had some contacts with celebrities which might have led to bodyguard/security work. Tr. 336-37. Given his injury profile, and the failure to seek or obtain other work, this simply is not compensable. Tr. 360. However, Lanier credibly articulated substantial damage to his self-worth arising from Sposato's actions.

*Ibrahim Zahran*

For nearly 25 years, plaintiff Zahran served as a corrections officer primarily in the Nassau County jail, though he did some work executing process in civil cases. Tr. 27. He was injured during a fight between two rival gang members in the visiting room, breaking his coccyx

---

[4] This testimony by Lanier – which the Court ultimately credits – became something of a litigative distraction. *See* DE 148-152, Electronic Order dated July 31, 2025. In its post-Inquest filings, the County Attorney targeted this evidence, suggesting that Lanier's description and the document that supported it constituted "wild exaggeration." DE 148 at 24. The County's attack proves unavailing for several reasons. First, the County's introduction of a barrage of hearsay statements, including Lanier's testimony at the criminal prosecution, the summations in that case and Judge Bianco's factual summary in connection with a habeas petition, are not properly considered record evidence as the County failed to introduce these materials at the time of the hearing or confront plaintiff with the same. *See, e.g.*, F.R.E. 801(d)(1) (requiring that a witness be cross-examined about prior statements before they may be considered.). Worse yet, examination of those statements reveals that the County's accusations constitute unfounded mischaracterizations.

bone and sustaining injuries to his knee and lower back, and leading to his retirement on disability. Tr. 28-33. After his recommendation for a handgun permit was rejected, deputy sheriffs came to his house and removed six handguns he maintained in his residence. Tr. 41. Zahran, a member of the honor guard for the Sheriff's Department, reported being "shocked" by the denial. Tr. 43. He tried to speak to Sposato but was unable to make an appointment to see him. Tr. 47-8. He also developed "reservations" about not having handguns available for self-protection. Tr. 44. However, he testified that since his retirement, he has never been confronted by someone he arrested. Tr. 66.

There is an important backdrop to one aspect of this plaintiff's testimony. On the first day of the Inquest, the Court, in trying to narrow the issues, pointed out that under the then-existing rules in Nassau County, citizens were free to maintain long rifles in their homes without the need for a permit. *See* Tr. of Proceedings, July 8, 2025; *cf.* Tr. 197 (plaintiff acknowledging this discussion). As such, in the presence of the parties, the Court and counsel discussed the fact that the damages arising from the risk of danger from not having a firearm would be limited to times when the plaintiffs left their homes. *Id.* Zahran offered testimony designed to challenge this conclusion, which, if accurate, would have been appropriate and welcome. However, the testimony he offered was none of these things.

Zahran, under oath, attempted to establish that having a handgun in the home was more important than a long rifle for self-defense. Tr. 46. He contended that "[h]aving a long gun in your house, you have a greater chance of that bullet penetrating the wall and going outside the house." Tr. 46. Only upon cross-examination did Zahran admit that, in addition to the six handguns he maintained in his home, he had three long rifles, including an AR-15 and a Mossberg shotgun. Tr. 63. Confronted by the Court about the inconsistency between his sworn

12

testimony concerning fears of piercing the walls with a stray bullet, which would not be the case with a shotgun, Zahran dissembled, indicating "[t]hat can be true depending on the load." *Id.* Only upon further questioning did Zahran acknowledge that the choice of ammunition, ranging from traditional "shot" (from which the shotgun derives its name), and a comparatively rare solid slug was entirely within his control. Tr. 64. This testimony and other ludicrous statements about "people" sleeping with handguns under their pillow, raise serious questions about this plaintiff's credibility. Zahran also testified about a traffic stop that occurred "about 2019" in which he showed his ID with a blue background, and questions that arose from the officer. Tr. 49. Since Sposato's successor, Sheriff Vera Fludd, began granting recommendation letters to the plaintiffs in 2018, the timing provided in Zahran's testimony appears to be inaccurate.

*Victor Patalano*

Plaintiff Patalano worked as a deputy sheriff, but not as a corrections officer, for over 26 years. Tr. 80-1. He worked largely executing process, including warrants and evictions under Kendra's Law. Tr. 80. In 2010, he slipped on ice, injuring his hip, leading to a hip replacement and retirement in 2013. Tr. 81-2. Like other plaintiffs, he was surprised to learn that his recommendation for a permit was denied, and he tried to contact Sposato, to no avail. Tr. 90. He also complained to then-Police Commissioner Thomas Krumpter, who ultimately provided Patalano with a target permit, allowing him to maintain his firearms. Tr. 90-1. This fact, to a limited extent,[5] mitigates Patalano's damages. In correspondence, Krumpter noted that a recommendation from the Sheriff was "an absolute prerequisite" to the issuance of a retired

---

[5] While this specific evidence was not elicited at trial, it is well known that a target permit did not function as general carry permit: holders of a target permit were generally limited to transporting a handgun to and from a range. *See* NASSAU COUNTY POLICE DEPARTMENT PISTOL LICENSE SECTION HANDBOOK, available at https://perma.cc/6JYG-5EDH.

officer permit.  Tr. 97.  Patalano described – in general terms – professional embarrassments resulting from the Sheriff's actions and, more specifically, a threat situation that arose when a Kendra's Law arrestee spotted him in a Target location and started to follow Patalano (and his grandson) through the store.  Tr. 93.

Unlike his fellow plaintiffs, Patalano's retirement ID was never changed to a blue background photograph.  Tr. 133.  So, he was less affected by these circumstances in several ways.

Patalano did not fare well on cross-examination.  The medical records introduced into evidence unequivocally state that, for a period of months if not years, Patalano was taking oxycodone and naproxen.  Ex. 2D.  And yet, both in testimony and in written representation to the Sheriff's department and his congressman, he represented that he was not taking any prescription medication.  Tr. 115-19, 131.  Police Commissioner Krumpter specifically cited these inconsistencies as one of the reasons that Patalano could not, absent further documentation, receive a pistol permit.  Ex. 2D.  These inconsistencies are troubling because they bear upon his credibility and, arguably, fitness to carry a firearm.

Finally, Patalano attributes Sposato's animus against him personally not to his disability, but to the following:

> Q.  Do you have any reason to believe that Mr. Sposato had some sort of personal animus toward you?
>
> A.  Yes.  I was a union rep [for] 20 years, I beat them on every case that went in front of them.  It cost them a lot of money, and he was going after me for that.

Tr. 124.  Had the County not conceded liability, the Court would have to consider whether this testimony would defeat Patalano's claim.  Nevertheless, his evident bias affects the weight of his testimony.

14

*Chris Todd, Esq.*

As their sole witness, defendants called Chris Todd, an attorney who had been employed as a deputy chief in the Legal Bureau of the Nassau County Police Department in a timeframe sometime after the rejection of the plaintiffs' applications, but close enough in time as to have some relevance. Tr. 368 *ff.* Todd provided general background information concerning the types of permits available, presumably to demonstrate that the plaintiffs could have mitigated damages by applying for different type of permits. Tr. 302. The mitigation point proved marginal. Most importantly, during his testimony, Todd acknowledged that which was all but obvious: the Sheriff's recommendation was an absolute prerequisite to the issuance to the issuance of a retired officer pistol permit. Tr. 386. And while Todd suggested that the failure of the Sheriff to issue a recommendation was not an absolute bar to obtaining a different class of pistol permit, he was unable to recall a single instance in which that happened. Tr. 387-88.

*Michael Sposato*

The testimony of defendant, former Sheriff Michael Sposato, proved dramatic even before he took the stand. On the first day of testimony, counsel for defendants advised the Court that Sposato was not present but would be the following day, and at the opening of the afternoon session, counsel advised that Sposato was on his way. Tr. 78-79. By midday on the second day, things had changed, and defense counsel announced that it would call Mr. Todd as its only witness. Tr. 300. Following an objection by plaintiffs' counsel, the revelation that Sposato had been at the Courthouse but had left, and a spirited discussion about adverse inferences, the matter was tabled until the end of the day. Tr. 301-03. After another application by plaintiffs and the sophistic argument by defense counsel that plaintiffs "could have subpoenaed him," the Court directed his return to permit plaintiffs' counsel to call Sposato to the stand. Tr. 366-67.

Defendants' vacillation as to whether they would call the defendant and principal witness seemed confusing and a bit mysterious. But the confusion and mystery evaporated shortly after Sposato began testifying.

Before embarking on a remarkable career in various appointed high-ranking law enforcement positions, Sposato had none of the experience, training or qualifications one might expect. He did not serve in the military. Tr. 412. He did not work as a peace officer or police officer. *Id.* Sposato took civil service exams in a bid to become both a police officer and a corrections officer, yet he was selected for neither position. Tr. 413-14. In fact, he never was appointed to any civil service position as the result of a merit-based process. Tr. 413. He does not hold a two- or four-year college degree. Tr. 421. At some point, he became an operator in the sewage treatment plant run by the Town of Oyster Bay. Tr. 414.

Following his tenure at the sewage treatment plant, he was appointed to work as a "Cook 1" at the Nassau County jail. Tr. 403-408. At the hearing, he initially dissembled, claiming that his role was managerial and he only supervised inmates cooking, but after being confronted with his deposition, he admitted that he was actually a jailhouse cook. *Id.* After working as jailhouse cook for about ten years, he became the kitchen supervisor for about six months. Tr. 409. After that, he was appointed to serve as an assistant to the Sheriff, and then quickly promoted to the position of Undersheriff, where he was "essentially number two in the jail." Tr. 412. From 2007 through 2011, he was appointed Acting Sheriff and then served as the "permanent Sheriff" from 2011 through the end of 2017. Tr. 403.

As Sheriff, he received a license to carry a handgun from Nassau County. Tr. 417. Though he held that license for seven years, he attended mandatory annual training to qualify with his weapons only once. Tr. 417-18, 420-21.

16

Early in his testimony, Sposato evidenced animus toward officers who received disability benefits following on the job altercations with inmates, stating "they're using our time [for sick leave] not their own time." Tr. 423. In direct testimony, he alluded to his resentment toward deputy sheriffs who retire on a disability pension:

> Well, they put in – it changes their retirement status like, if you go for like a regular – like look, if it's a regular disability [sic] you get, like, you know, a third. 207-c is a three-quarter disability. So it changes the retirement status.

Tr. 423. These comments by Sposato dovetail with other evidence of record demonstrating that his denial of handgun permits emanated from an apparent desire to deter officers who had been disabled on the job from seeking disability retirement benefits. *Compare* Tr. 188 (Sposato explains to Lenoci that he denied his firearms request because "well, you went out three quarters"); Tr. 350 (Sposato tells Lanier that denials were "just business"); Ex. 5E (letter from Sposato noting "your ability to possess firearms was restricted as a result of the injury that culminated in your disability retirement"). Sposato claimed an inability to recollect having the conversations with Lenoci and Lanier. Tr. 433. The undersigned finds these conversations almost certainly happened.

Sposato repeatedly (though incredibly) claimed that he was unaware of the force and effect of his withholding of a recommendation for a firearms permit. Tr. 437-38, 449-50, 473-74; *Compare* Tr. 97 (Police Commissioner Krumpter's view that recommendation from the Sheriff was "an absolute prerequisite" to the issuance of a retired officer permit); Tr. 388 (Todd unable to recall any such permit issued without recommendation from Sheriff). Like Todd, Sposato could not identify a single instance in which a permit was granted in the face of a non-recommendation from him. Tr. 438. Meanwhile, he stated that he approved hundreds of "good-guy" letters, yet he denied very few of them – and only with respect to disabled officers. Tr.

17

470-71 ("there would be ones that were just service retirements that were just cut and dry"). Eventually, Sposato conceded that he never denied handgun permit recommendations for officers leaving on a "regular service retirement." *Id.*; Tr. 494 ("We've always given a good-guy letter, that was just the process.").

As defendants conceded liability, Sposato's explanations for denying permit recommendation for the plaintiffs bear heavily on his credibility and an assessment of his motivations. He claimed that he denied these recommendations largely on account of plaintiffs' failure to qualify with their firearms annually. Tr. 435. At the same time, Sposato was aware that officers and deputy sheriffs who were out of work after being injured in an inmate incident and receiving 207-c disability payments were not permitted to qualify with their firearms. Tr. 426. Sposato denied a recommendation to plaintiff Lanier even though he *had* qualified with his firearm, Tr. 439, helping establish that the denials based on qualification were pretextual. Sposato denied permit recommendations even when confronted with uncontested evidence that the applicant could maintain and use a firearm. Tr. 442, 447. In remarkable testimony, Sposato stated "Maybe the police surgeon might feel . . . he can possess [a firearm]. I don't take any advice from the police surgeon." Tr. 454-56.

Ultimately, the rationale that the corrections officers and deputy sheriff had not qualified annually proved a canard. First, as noted, Sposato maintained a firearm permit for seven years though he only performed the required annual training once. Second, he understood, under the rules administered by his department, officers out on disability were not permitted to qualify. Third, though he was well positioned to allow these officers to qualify before denying the recommendations for a permit, he made no efforts to do so. Tr. 452-53. Taken together, this

record demonstrates that Sposato had no real concerns about pistol qualification; instead, he vindictively denied permits for disabled officers.

Overall, the record demonstrates that Sposato denied handgun permits to the plaintiffs solely because of an animus he maintained against disabled officers, even though those disabilities had no demonstrable effect on their ability to use and maintain a firearm.  Sposato meted out petty, bureaucratic retaliation upon these officers irrespective of the undeniable risks these retired officers faced from encounters with former inmates – a risk which he reluctantly acknowledged.  Tr. 451. Thus, he denied these officers handgun permit recommendations, while remaining indifferent toward these risks.  Tr. 484.

Late in his testimony, Sposato casually mentioned a fact that quickly devolved into a jaw-dropping moment.  Asked by the Court about his current profession, Sposato replied "I'm back at the jail as the Commissioner of Corrections."  Tr. 467.  According to his testimony, in that position, he will, once again, assume responsibility for signing the permit recommendations for retiring officers and deputy sheriffs, as he is again responsible for "day-to-day operations of the Sheriff's department."  Tr. 479, 481.  In something that reveals a great deal about the County's culpability in this matter, Sposato conceded that no one had "ever [asked him] any questions about the particular[s] of this case" before again giving him this responsibility.  Tr. 481.  Sposato then walked this back, testifying that he was only "assuming" that he would be getting this responsibility.  Tr. 481.

Considering the history of and evidence in this case, the County's appointment of Sposato as Sheriff and his subsequent appointment and reappointment as Commissioner of Corrections can be euphemistically described as surprising, though other adjectives spring to

mind.  According to the President of the Nassau County Sheriff's Correction Officers Benevolent

Association (COBA), upon the unexpected resignation of the prior Correction Commissioner:

> My first concern was who Commissioner Corsini's successor would be and I was
> told everything is fluid and they would get back to me, but that former Sheriff
> Michael Sposato was being looked at. I immediately explained that months earlier
> when rumors were flying about his return, the County Executive himself assured
> me that Mike Sposato will never be back at the jail in any capacity whatsoever.

President's Message, May 9, 2025, available at https://perma.cc/GM4U-35UG.  Sposato was

reappointed Commissioner of Corrections in January 2025 – well after the County conceded

liability in this matter.  *See* "Sposato Returns to the Jail," *Newsday*, May 21, 2025.   As *Newsday*

reported:

> Sposato's past tenures as sheriff and as commissioner were controversial.
> Sposato started at the jail in 1994, as a chef, and then served as kitchen
> supervisor. By 2005, he became the county sheriff's chief of staff and, from 2008
> to 2018, he served as county sheriff.  The Correction Officers Benevolent
> Association had long opposed his leadership, with former COBA President Brian
> Sullivan at one point calling his time in office "a reign of destruction."  Under
> Sposato's watch, there were four inmate suicides between January 2010 and
> January 2011 alone, and another four deaths between 2011 and 2014, in part due
> to inadequate medical care provided by Armor Correctional Health Services —
> which Sposato had brought in to replace NUMC as the jail's medical care
> provider.[6]

*Id.*  Records of this Court reflect that Sposato was implicated in the corruption prosecution

against former County Executive Ed Mangano, among others.  Testimony in that case reveals

specific evidence linking Sposato to the infamous "bread and rolls" contract awarded to

convicted restaurant owner Harendra Singh, who owned a floundering bakery in Rockland

---

[6] The shameful, tragic history of Armor Healthcare's role at the Nassau County jail is well
documented in case decisions from this Court and other authoritative public reports.  *See, e.g.,*
*Gleeson v. Cnty. of Nassau*, 2019 WL 4754326, at *6 (E.D.N.Y. Sept. 30, 2019) (quoting a state
medical review board's finding that "Armor Inc. . . . has engaged in a pattern of inadequate and
neglectful medical care and questions their ability to meet and provide for the healthcare needs
of jail inmates.")

County, New York.  Singh testified that he gave Sposato an iPhone as part of the consideration of being awarded that contract.  *See* "Singh, in his Testimony, Describes Lavishing Gifts on Officials," *Newsday*, March 24, 2018.  Given this troubling history, the appointment and reappointment of Sposato by the County seems virtually inexplicable.[7]

### Discussion

Plaintiffs' claims against Sposato and the County are brought pursuant to 42 U.S.C. §1983, which provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ." 42 U.S.C. §1983.  "[T]his language does not create substantive rights; rather, it creates a mechanism by which individuals can vindicate the violation of rights secured elsewhere."  *Santucci v. Levine*, No. 17-CV-10204 (PMH), 2021 WL 76337, at *3 (S.D.N.Y. Jan. 8, 2021).  Here, plaintiffs' case is based upon the Equal Protection Clause, requiring "proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980).  And while defendants conceded liability, obviating the need for further inquiry, such evidence, even in the limited inquiry undertaken during the inquest, was present in abundance.

---

[7] Media reports suggest that Sposato's appointment could be tied to large political donations. *See, e.g.,* "Sposato's Appointment to Run Nassau Jail to be Focus of Legislative Hearing," *Newsday*, December 13, 2022 (positing a link between a series of donations by Sposato and his initial appointment as Commissioner of Corrections in 2022).

Liability for the harms imposed fall both upon Sposato, in his individual capacity, and the County. Based on the undisputed evidence, Sposato was a policymaker, and his actions in denying permits to disabled officers constituted a policy of the County. In fact, counsel for both sides, as well as certain witnesses, repeatedly referred to Sposato's widespread denial of these benefits – which had never been withheld before – as a "revised" policy, and the actions of his successor in granting recommendations to plaintiffs as a second change in policy. *See, e.g.,* Tr. 67, 121, 224, 228; DE 148 at 11 (defendant's brief noting that Sposato's actions were "policy-based," *id.* at 12 (noting that "the policy was changed"); *id.* at 14 (same), *id.* at 25 (same). Further reflecting Sposato's distain for officers who retired on a disability pension, his counsel repeatedly and gratuitously points to the tax benefits of such a pension, noting that payments under such a plan are "tax free." DE 148 at 4 (noting "tax advantages to such a retirement"), *id.* at 18 (Lenoci "was not on ¾ tax free"); *id.* at 19 (Delle "retired on a ¾ tax free disability").

Resolution of this matter involves two separate, though somewhat interrelated tasks: (1) setting appropriate compensatory damages, which turns, largely, on each plaintiff's testimony and (2) fixing punitive damages, if any.

**Compensatory Damages**

While the harms in this case are highly unusual, plaintiffs were able to demonstrate several distinct harms from Sposato's withholding of firearms permit recommendation following years of honorable service, for which they are entitled to compensation: (1) emotional distress, which includes humiliation, harm to self-worth and reputational harm based upon impact in their standing among law enforcement agents and others; and (2) risks of danger and to themselves and their families and concomitant worry arising from interactions and confrontations with former inmates, which were, in some cases, heightened by the absence of a firearm for self-

22

protection.[8]  Generally, the harms complained of fall within the ambit of emotional damages, yet at times have a distinctly different character.

"A claim for emotional distress is considered typical or 'garden-variety' where the plaintiff did not seek medical treatment but where the evidence in the form of plaintiff's testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress." *Setty v. Fitness*, No. 17-CV-06504 (NGG)(SMG), 2018 WL 8415414, at *17 (E.D.N.Y. Dec. 18, 2018), *adopted by sub nom. Setty v. Synergy Fitness*, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019) (noting that "courts generally award damages for garden-variety emotional distress claims ranging from $5,000 to $35,000"). Here, none of the plaintiffs sought mental health treatment, generally limiting this to a garden variety analysis. Yet aspects of the plaintiff's experiences reach outside the garden variety realm. For example, the harm to their individual self-worth of receiving what seemed, in effect, to be a dishonorable discharge from their service and the reputational consequences associated therewith seemed particularly impactful. *Razzano v. Cnty. of Nassau*, No. 07-CV-3983 (ADS) (AKT), 2012 WL 1004900, at *4 (E.D.N.Y. Feb. 27, 2012), *adopted by*, 2012 WL 1004898 (E.D.N.Y. 2012) ("compensatory damages may also include such injuries as impairment of reputation . . . personal humiliation, and mental anguish and suffering."). Furthermore, the harm to reputation in the law enforcement community and, for some, safety risks and justifiable fears following their retirement due to ongoing encounters with former inmates and concomitant limitations imposed upon their everyday lives represented ongoing and different harms.

---

[8] None of the plaintiffs articulated a compensable effect on subsequent employment opportunities as plaintiffs were, in many instances, too badly injured to hold another position that required a firearms permit, and none attempted to hold any other job, further undercutting a true interest in subsequent employment. *See, e.g.* Tr. 230-3 (Lenoci testifies that even after getting the firearms permit in 2018, he still didn't apply for a job as he remained unable to work full time).

All of this, of course, is highly subjective, resting largely on plaintiffs' testimony, and therefore requires a credibility assessment as to each plaintiff's reporting. While credibility evaluation usually falls to a trial jury, at an inquest, hearing or bench trial, the Court is required to make its own credibility assessments. The evaluation of each witness's testimony turns, of course, on such matters as "impressions of the witness, the witness's reactions to questions, [his or] her demeanor, observed or expressed biases, and [an] overall 'gut feeling' about the witness."[9] Important elements of the evaluation of credibility are not captured on the "cold record." *Bing Song Zhu v. Gonzales*, 198 F. App'x 123, 124 (2d Cir. 2006) ("a fact-finder who assesses testimony together with demeanor is in the best position to discern the impression conveyed by the witness"). More important, though often rarer, are elements such as common sense, logic flow, corroboration and inconsistencies.[10] *Han Xu v. Lynch*, 639 F. App'x 20, 21 (2d Cir. 2016) (finder of fact may "base a credibility finding on [witnesses'] demeanor, the plausibility of his account, and inconsistencies in his statements and other record evidence without regard to whether they go to the heart of the applicant's claim."). Importantly, "a single instance of false testimony may infect the balance of [a party's] uncorroborated or unauthenticated evidence." *Siewe v. Gonzales*, 480 F.3d 160, 170 (2d Cir. 2007) ("We have "frequently ... held [that] application of the *maxim falsus in uno, falsus in omnibus* [false in one thing, false in everything] may at times be appropriate.")

In making these awards, the undersigned has carefully considered all of the circumstances, including the serious consequences that could have resulted from the improper actions of the defendant and the significant impact on the plaintiffs, though, at the same time,

---

[9] Gary R. Brown, "Law School Didn't Prepare You for This: Tips for the Internal Investigation", *ACC Docket*, May 2010, at 58, 66, available on Westlaw.
[10] *Id.*

recognizing that the violations were remediated by Sheriff Fludd after a relatively short period – generally no more than three years.  Having carefully considered the evidence at the inquest, and following a careful evaluation of each plaintiff's issues and claims, the Court awards compensatory damages to the plaintiffs totaling $133,000, divisible as follows:

| Plaintiff | Emotional Distress | Self-Protection Damages | Total |
|---|---|---|---|
| Delle | $5,000 | $1,000 | $6,000 |
| Lanier | $15,000 | $15,000 | $30,000 |
| Lenoci | $15,000 | $30,000 | $45,000 |
| Patalano | $5,000 | $1,000 | $6,000 |
| Perros | $15,000 | $25,000 | $40,000 |
| Zahran | $5,000 | $1,000 | $6,000 |
| **Total** | | | **$133,000** |

### Punitive Damages as against Sposato

"Punitive damages are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example."  *Stampf v. Long Island R. Co.,* 761 F.3d 192, 209 (2d Cir. 2014).  "Awards of punitive damages are by nature speculative, arbitrary approximations.  No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct.  Nor is there any formula to determine the dollar amount needed to effectuate deterrence."  *Payne v. Jones,* 711 F.3d 85, 93 (2d Cir.2013).  Nevertheless, the Supreme Court has set forth "three guideposts" for evaluating the size of a punitive award: (1) "the degree of reprehensibility of the defendant's

conduct"; (2) the punitive award's "ratio to the actual harm inflicted on the plaintiff"; and (3) "the civil or criminal penalties that could be imposed for comparable misconduct." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575–83 (1996).

Here, application of the *Gore* factors to Sposato's conduct reveals that a substantial award is warranted.  First, as to reprehensibility, "[t]he Supreme Court in *Gore* noted that reprehensibility is 'perhaps the most important' factor in assessing a punitive damage award." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996).  In making this determination, "[a]ggravating factors include (1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Id.*  Absent violence, the first consideration also encompasses "an element of real and threatened force." *Id.* at 810; *see Adedeji v. Hoder*, 935 F. Supp. 2d 557, 571 (E.D.N.Y. 2013) (upholding modest punitive award where defendant "disregarded a clear risk of substantial harm").  Here, a consideration is the risk of violence not from defendant but from numerous former inmates to which these plaintiffs were exposed without the ability to reasonably defend themselves.  In that regard, the case bears some comparison to *Williams v. Marinelli*, No. 13-CV-1154 (MPS), 2017 WL 11473740, at *26 (D. Conn. Feb. 8, 2017), which analyzed claims in which defendants were "deliberately indifferent" to the risk of harm to plaintiffs, but "did not deliberately inflict physical harm upon the plaintiffs."  There, the district court reduced a jury punitive damages award to $50,000 based on comparator cases involving somewhat analogous circumstances.  *Id.* (collecting cases reporting awards for deliberate indifference to physical harm ranging from $1,000 to $18,250 for instances of indifference.).

As to deceit and malice, Sposato evidenced both.  His animosity toward the officers who accepted disability pension is evident throughout the record.  Sposato also proved deceitful in his official actions, in correspondence and even during his testimony at the Inquest.  Thus, this second factor is present in abundance.  Third, in terms of repeated instances of conduct, his actions were systematic in nature, with recurrent administrative steps along with efforts to dissemble and conceal his true purposes.  Thus, across the spectrum of these considerations, Sposato's actions were highly reprehensible, particularly when emanating from one of the County's chief law enforcement officers.  And, of course, his position as a prominent public official raises the concerns of deterrence, an important purpose of punitive damages.

*Gore* further requires comparing the award to "civil and criminal penalties for comparable misconduct."  517 U.S. at 583. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574.

Here, federal criminal penalties for civil rights offenses provide a useful measure. *Anderson v. Aparicio*, 25 F. Supp. 3d 303, 312 (E.D.N.Y. 2014), *aff'd and remanded sub nom. Anderson v. Cnty. of Suffolk*, 621 F. App'x 54 (2d Cir. 2015) ("Where a jury imposes punitive damages for a violation of §1983, the penalties imposed under federal criminal law for similar offenses provide an excellent metric for evaluation of excessiveness. And, indeed, federal criminal law offers a highly analogous provision for deprivation of rights under color of law."); *cf. Stratakos v. Nassau Cnty.*, No. 15-CV-7244 (GRB), 2021 WL 2587722, at *13 (E.D.N.Y. June 24, 2021) (explaining that "federal criminal law provides a useful framework" in calculating punitive award for civil rights violations by law enforcement officers).  The Second

Circuit has adopted this approach. *See Jennings v. Yurkiw*, 18 F.4th 383, 393 (2d Cir. 2021) ("Where a jury imposes punitive damages for a violation of §1983, the penalties imposed under federal criminal law offer a useful comparison."). Thus, in considering a punitive award, the Court looks to 18 U.S.C. §242 which provides, in relevant part, as follows:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State [ ] to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States [ ] shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 242. "This statute carries up to one year of imprisonment (rendering it a Class A misdemeanor) or a fine of up to $100,000. 18 U.S.C. §§3581, 3571(b)(5)." *McDevitt v. Suffolk Cnty.,* No. 16-CV-4164 (GRB)(ST), 2024 WL 1270811, at *9-10 (E.D.N.Y. Mar. 26, 2024). Thus, imposition of awards less than $100,000 for each of the plaintiffs is well within the appropriate range.

Which leaves the concept of ratio which, often helpful in evaluating the propriety of a jury award, in this case, can help in the determination of punitive damages. "[T]he Supreme Court has upheld a punitive damage award of 'more than 4 times the amount of compensatory damages.'" *Patterson v. Balsamic,* 440 F.3d 104, 121 (2d Cir.2006) (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)). Indeed, the notion of punitive damages measured as a small multiple of compensatory damages is supported by centuries of jurisprudence and legislative pronouncements. *Gore*, 517 U.S. at 580–81. ("Scholars have identified a number of early English statutes authorizing the award of multiple damages for particular wrongs [including] 65 different enactments during the period between 1275 and 1753 [that] provided for double, treble, or quadruple damages"). In one case involving a compensatory calculation that, "by its nature, is necessarily [ ] largely arbitrary," albeit exponentially larger, the Second Circuit

held that "an approximate 2:1 ratio is both permissible under the Constitution and consistent with the established policies adopted and adhered to by this Court." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 166-67 (2d Cir. 2014) (noting that, in the face of higher awards, a 1.5:1 or 1:1 ratio may be the maximum permitted under the Constitution).

It is not, of course, a mathematical formula. But under the circumstances, given the size of the compensatory damages, a punitive award of $25,000 per violation – totaling $150,000 – seems appropriate under the circumstances.[11] Such an award proves sufficient but not greater than necessary to provide the intended punitive and deterrent effects. In the aggregate, then, the punitive award of $150,000 is close to the aggregate of the compensatory awards, which total $133,000, rendering the punitive award proportional to the damage inflicted.

The total awarded to each plaintiff is listed below:

| Plaintiff | Compensatory Award | Punitive Award | Total |
|-----------|--------------------|----------------|-------|
| Delle | $6,000 | $25,000 | $31,000 |
| Lanier | $30,000 | $25,000 | $55,000 |
| Lenoci | $45,000 | $25,000 | $70,000 |
| Patalano | $6,000 | $25,000 | $31,000 |
| Perros | $40,000 | $25,000 | $65,000 |
| Zahran | $6,000 | $25,000 | $31,000 |

---

[11] The Court considered awarding punitive damages on a *pro rata* basis, "with each plaintiff receiving a share proportional to the compensatory damages they receive." *Silivanch v. Celebrity Cruises, Inc.*, No. 95-CV-0374 (BSJ) (JCF), 2000 WL 1211578, at *2 (S.D.N.Y. Aug. 25, 2000) (applying *Gore*'s ratio principle "to the division of an award among multiple plaintiffs"). However, in opting to award punitive damages on a *per capita* basis, the court notes that, unlike *Silvanch*, this is not a case involving comparison between "a plaintiff who has incurred an insignificant injury [and] one who has been grievously harmed." *Id.* at *3. Rather, the damages here fell within a much narrower range, while the Sheriff's actions were exactly the same with regard to each plaintiff.

| Total | $133,000 | $150,000 | $283,000 |
|---|---|---|---|

**Punitive Damages as against Nassau County**

The law renders municipalities, like Nassau County, immune against punitive damages in a §1983 action. "A municipality . . . can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267 (1981) (holding that Congress did not provide for punitive damages against a municipal entity under §1983). This immunity derives from longstanding common law principles:

> Those who violate the laws of their country, disregard the authority of courts of justice, and wantonly inflict injuries, certainly become thereby obnoxious to vindictive damages. These, however, can never be allowed against the innocent. Those which the plaintiff has recovered in the present case ... being evidently vindictive, cannot, in our opinion, be sanctioned by this court, as they are to be borne by widows, orphans, aged men and women, and strangers, who, admitting that they must repair the injury inflicted by the Mayor on the plaintiff, cannot be bound beyond that amount, which will be sufficient for her indemnification.

*City of Newport,* 453 U.S. at 261 (quoting *McGary v. President & Council of the City of Lafayette*, 12 Rob. 668, 677 (La.1846).

Though it enjoys legal immunity from punitive damages, this should not, in any way, diminish the findings of the County's culpability in this matter. First, Nassau County conceded liability, and in doing so, has embraced Sposato's systematic violation of the plaintiff's constitutional rights as its own policy. It continues to do so. DE 148 at 25 ("Nassau County conceded liability because the policy that was followed by the then Sheriff upon analysis did not make sense."). And, notwithstanding his disastrous performance in this and related matters, the County saw fit to reappoint Sposato as Commissioner of Corrections, giving him broader authority including, once again, control over this process.

30

Furthermore, Nassau County acknowledges that it will indemnify Sposato against the compensatory and punitive awards imposed in this case, DE 152, even though New York public policy prohibits municipal indemnification for punitive damages in a §1983 action. *See Suffolk Cnty. Patrolmen's Benevolent Ass'n, Inc. v. Suffolk Cnty.*, 595 F. Supp. 1471, 1480 (E.D.N.Y. 1984), *aff'd sub nom.* 751 F.2d 550 (2d Cir. 1985); *see also Hartford Acc. & Indem. Co. v. Vill. of Hempstead*, 48 N.Y.2d 218, 228 (1979) ("[W]e conclude that the rule to be applied with respect to a punitive damage award made in a Civil Rights Act action is that coverage is proscribed as a matter of public policy. We reach that conclusion primarily because to allow insurance coverage is totally to defeat the purpose of punitive damages.").

This case is not unique, as Nassau County has, in derogation of its legal immunity and contravention of New York State public policy, indemnified officers against punitive damages in numerous §1983 actions. *See, e.g., Galloway v. Nassau Cnty.*, 569 F. Supp. 3d 143, 149 (E.D.N.Y. 2021), *aff'd sub nom. Galloway v. Cnty. of Nassau,* 589 F. Supp. 3d 271 (E.D.N.Y. 2022) ("Nassau County Police Officer Indemnification Board agreed to indemnify each individual defendant for all damages, including punitive damages"). Thus, while the Supreme Court has taken pains to ensure that the punitive damages imposed upon Sposato for his lawless action would not be borne by the "widows, orphans, aged men and women" of the County, Nassau County has chosen to embrace Sposato's actions and levy those penalties upon its citizens.

### Requests for Injunctive Relief

In their complaint, plaintiffs seek injunctive relief against Sposato and the County, including orders precluding the denial of handgun permit recommendations to similarly situated individuals and the appointment of a Special Master to oversee the process. At one point, with

31

the installation of a subsequent Sheriff who reversed Sposato's unconstitutional policies in this regard, this request appeared superfluous.  However, considering Sposato's unforeseen testimony that he expects to reassume control of that process, the status of such request – as well as questions of standing to pursue such relief – may have become newly relevant.

The parties have 30 days to meet and confer concerning this issue, and counsel for plaintiff will file a letter advising as to the status of plaintiffs' request for injunctive relief.

SO ORDERED.

Dated: Central Islip, New York
         September 3, 2025

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge