UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALEXANDER PERROS, THOMAS DELLE,
NICHOLAS LENOCI, VICTOR PATALANO,
RONALD LANIER and IBRAHIM ZAHRAN
Collectively on Behalf of All Persons
Similarly Situated and/or Sheriff's Department
Former Personnel Unfairly Denied Proper
"Recommendation for Consideration of
Application for Pistol License for Retiring
Peace [Police] Officer" Forms and/or "*Good Guy
Letters*" Following Retirement, Due to Injury
and/or Disability,

                       Plaintiffs,

        -against-

COUNTY OF NASSAU and MICHAEL
SPOSATO, in his Individual and Official
Capacities,

                      Defendants.
------------------------------------------------------------------x

15-CV-05598 (GRB)(ARL)

DECLARATION OF FREDERICK K. BREWINGTON IN SUPPORT OF PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES AND OTHER DISCRETIONARY COSTS PURSUANT
TO 42 U.S.C.§ 1988 AND FED. R. CIV. PROC. 54(d)

FREDERICK K. BREWINGTON declares, pursuant to 28 U.S.C. § 1746 and under penalty
of perjury, as follows:

1.     I am the founding member of the Law Offices of Frederick K. Brewington (the "Law
Offices"), counsel for Plaintiffs, ALEXANDER PERROS, THOMAS DELLE, NICHOLAS
LENOCI, VICTOR PATALANO, RONALD LANIER and IBRAHIM ZAHRAN. I submit this
declaration in support of Plaintiffs' motion for discretionary costs and reasonable attorneys' fees,

pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. Proc. 54(d)(2), for the work I and my staff have performed on his behalf.

2.     On Plaintiffs' behalf, the Law Offices seeks reasonable attorneys' fees in the amount of $221,895.00.  I seek compensation at the hourly rate of $650 for the work I performed.  I detail below the hourly rates sought by the attorneys and non-attorneys who worked on this matter.  I also seek costs in the amount of $9,389.43.  As discussed below and in the accompanying memorandum of law, this request should be granted in its entirety.

## PRELIMINARY STATEMENT

3.     It has been and continues to be our honor to represent each of the Plaintiffs.  Working with these gentlemen on this matter required special skills from our staff to perform not only the legal work necessary to seek justice for them but to address their needs as former law enforcement officers who felt abused by their former employer, as well as being extremely concerned about each of their representations and relationships which they have spent decades building and protecting. The hurt, embarrassment and worry that each of them displayed require us to not serve as their lawyers, but fill the role and remain their 'counselors at law.'

4.     The instant case involves six (6) former Nassau County Correction Officers or Deputy Sheriffs who, at the hands of Nassau County and Michael Sposato, were denied the benefit of their status as retired law enforcement officers to a "good guy letter" because of their having retired as a result of their respective disabilities.  As to the actions of Mr. Sposato and Nassau County the Court has decided that they caused and directly participated in, the systemic denial of rights, discrimination and improper treatment that occurred against the Plaintiffs and had the authority, power and capacity to end said systemic abuses, yet failed to do so; and infringed upon Plaintiffs' property rights,

retaliated against Plaintiffs for belonging to a protected class of employees with disabilities, removing the Plaintiffs from the same level as other former Correction Officers and Deputy Sheriffs, retaliating against Plaintiffs for retiring due to their respective disabilities; and generally violating their rights as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

5.     In addition, the Court has granted Summary Judgment as the allegations and cause of action which relates to and support the *Monell* cause of action in which the Plaintiffs allege that the COUNTY OF NASSAU has permitted, tolerated and encouraged a pattern and practice of unjustified, unreasonable denials of Good Guy Letters to Corrections Department retirees who seek to retire due to disabilities.  Although such conduct was improper, said incidents were supported by the COUNTY, its agents, employees and servants including its top decision maker, Defendant SPOSATO.

6.     Each of the Plaintiffs retired after service to the County of Nassau and they worked an average of twenty (20) years in their jobs providing care, custody, and control at the Nassau County Correctional Facility.  They each suffered injury or medical conditions which required them to leave the service of the County in their roles as law enforcement officers.  However, each of the Plaintiffs were not rendered unable to possess, use and own firearms on equal terms as their sister and brother officers who retired without a disability.  Yet, each of them were denied their "good guy letter" as a direct result of their status of being disabled at the time of their retirement. This treatment and the decisions, biases, prejudices, differential treatment, and actual discrimination leveled against each of the Plaintiffs by Mr. Sposato forms the gravamen of the underlying complaint before the Court.

7.      As part of Document #137, filed by the Defendants on December 22, 2023 in which

they admitted liability, the Defendants wrote:

> First, as result of defendants' concession of liability, plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988. "Plaintiffs' success was substantial and they are, therefore, clearly prevailing parties under § 1988. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983). A formal judgment is not required for a party to prevail; it is the substance, not the form, of the final remedy that must be examined." *Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F.Supp. 509 (S.D.N.Y. 1984). The result is that plaintiffs' attorney must make an accounting of his fees to date. Defendants see no need for a trial on the amount of attorney's fees, as this will only cause an unnecessary increase in attorney's fees. Defendants will review Mr. Brewington's billing records and promptly report to the Court as to any objections or proposed revisions.

8.      The parties now find themselves as the very stage to which Defendants referred some

two and a half years ago.  Between that time of the admission of liability, the Court has conducted

a trial on damages, issued its Decision, which begins with:

> "I do solemnly swear that I will support the Constitution of the United States, and the Constitution of the State of New York, and that I will faithfully discharge the duties of the office of the Sheriff of Nassau County, according to the best of my ability."
> *-Oath required by the Constitution of the State*
> *of New York, Article XIII, Section 1.*

> Thomas Jefferson once characterized "the office of sheriff [as] the most important as of all the executive offices of the country."*1([Footnote: 1The Best Letters of Thomas Jefferson, Houghton Mifflin Company (1926) at 214]*  In the lore of the Old West, the sheriff stands as an honorable figure who brought order to a lawless region. This perception endured. In High Noon (1952), Gary Cooper portrays a lawman who, though abandoned by his community, is driven by integrity to risk everything to battle lawlessness. In modern parlance, the idiom "There's a new sheriff in town" denotes the arrival of a leader who will enforce rules that have been neglected. Particularly when set against this illustrious history, the testimony of and actions by the individual defendant in this case – Michael Sposato, former Sheriff of Nassau County – prove disgraceful. (MEMORANDUM & ORDER FOLLOWING INQUEST ON DAMAGES, Hon. Gary Brown, Court Document 155 Filed 09/03/25, pp. 1-2)

9. The Court, in rendering its decision determined that:

The total awarded to each plaintiff is listed below:

| Plaintiff | Compensatory Award | Punitive Award | Total |
|---|---|---|---|
| Delle | $6,000 | $25,000 | $31,000 |
| Lanier | $30,000 | $25,000 | $55,000 |
| Lenoci | $45,000 | $25,000 | $70,000 |
| Patalano | $6,000 | $25,000 | $31,000 |
| Perros | $40,000 | $25,000 | $65,000 |
| Zahran | $6,000 | $25,000 | $31,000 |
| **Total** | **$133,000** | **$150,000** | **$283,000** |

10. In addition to determining damages, the Court issued Document 168 as its **ORDER FURTHER AMENDING FINAL JUDGMENT**, and granted to Plaintiffs injunctive relief as to the County of Nassau and Defendant Sposato. (Document 168 Filed 06/18/26)

11. The Court's determination as to damages and injunctive relief are supported by ample evidence.

12. The instant application is inclusive of the work done on this case as of the time of its filing, including the drafting of this application.

13. My staff and I have kept contemporaneous records of the time we have spent in this litigation. Once the weekly billing records are submitted by legal staff, they are entered by our billing

staff into our computerized billing system, which then generates the billing worksheet such as is attached hereto as Exhibit 1.

14. The detailed activities and totals are set forth in a schedule detailing Timekeeper and task that is set out in Exhibit 1. More specifically, this schedule sets forth, by date, a description of the work performed and, by reference, the persons performing said work, the hourly rate being applied, as well as the total time allotted to the work performed. As noted, the records reflect all hours expended through the filing of this application. The billing records also contain a summary of each person for whom time entries have been made, and provides a total of billable time for each person, as well as billing rates. (Exhibit 1 at page 57). Following the submission of this application, it is anticipated that Defendants will submit opposition papers, which will require counsel to do more work. Additional work will be performed in response to the Defendants' post-trial motions.

### ABBREVIATED STATEMENT OF FACTS

15. The Court's familiarity with the facts of this case is assumed. Accordingly, we provide an abbreviated version for general context.

16. All six of the Plaintiffs were in good standing as corrections officers or sheriffs at the time of their retirement. All of the Plaintiffs had been deemed physically unrestricted to own their firearms. Five of the Plaintiff's received 207-c disability and one received their regular retirement benefits.

#### A. Alexandros Perros

17. In Plaintiff Alexandros Perros' Federal Complaint he originally alleged that he sustained an injury on the job during his time as a corrections officer when he attempted to stop an inmate from escaping from the Psychiatric Unit by physically wrestling with the inmate which

caused injury to his knees, shoulders, and back as well as herniations. These injuries rendered Mr. Perros disabled and Mr. Perros remained out of work and was awarded 3/4 disability as a result. (Complaint¶ ¶31,32,33).

18.     When Mr. Perros applied for retirement he also applied for a good guy letter from the Sheriff's Department. This good guy letter would allow him to possess and carry a pistol as a retiree. On March 19, 2015, Plaintiff Perros' good guy application was summarily denied by Sheriff Sposato although Plaintiff was physically able to carry and possess a firearm. The only reason Alexandros Perros application to possess a firearm following his retirement was denied was due to his disability status. (Complaint¶ ¶36, 37, 44).

19.     At the trial on damages, Alexandros Perros testified that, he was retired and had been retired for nine (9) years from the Nassau County Sheriff's Department where he served as a corrections officer for ten (10) years. (Tri. Tr. 136:20-137:9). Mr. Perros explained that as a result of the injury to his back and his knee he received 207-c disability as a result of the police surgeons decision that he had to retire. (*Id* at 138:4-21). The police surgeons decision was based on what Mr. Perros categorized at trial as cascading events. These cascading events included being injured in the line of duty, receiving treatment for the injuries, then surgery, and then from the surgery he had blood clots which led to other medical problems. (*Id* at 139:1-5). Mr. Perros admitted that at retirement he expected that he would have received a recommendation from the jail. (Id at 139:10-13).

20.     In support of Mr. Perros testimony, Plaintiff's exhibit 3 "Recommendation for Consideration of Application for Pistol License" was received into evidence. In this document, the medical investigations unit had noted from Dr. M. Goldstein that Mr. Perros "may retain and

safeguard his firearm with no restrictions". (Plaintiffs' Exhibit 3; Tri. Tr. 140:15-25). Dr. Goldstein was the Doctor treating Plaintiff for his injuries. (Perros Tri. Tr. 141:1-2). Plaintiffs' Exhibit 3 further states that he has no, "impediments, conditions or restrictions which would bear upon his request for a pistol license." Yet, at the bottom of his application the box is marked "Do not recommend" and signed by Sheriff Sposato. (Plaintiff's Exhibit 3).

21.     Being denied his pistol license had a profound effect on Mr. Perros, first, they took his guns. (Tri. Tr. 141:1-2).  Second, Mr. Perros was humiliated in front of officers he had known and worked with and deeply hurt after years of impeccable service when he went down to the police department and realized that he had been denied his good guy letter. (Tri. Tr. 146:3-25). Moreover, it stalled Mr. Perros life as he could not seek other employment. (*Id.* At 147:1-19).  Mr. Perros could not seek other employment that involved a firearm for those ten years. That included being able to get another job in security. (*Id.*) Further, not having the good guy letter Mr. Perros deserved also affected his social life and his home life. Friends asked Mr. Perros "What are you hiding?" when he wasn't hiding anything. It also seriously affected his home life and his relationship with his wife, Patricia, who was also a Corrections Officer and who would go to work and have other corrections officers ask her about what happened to him. Mr. Perros and his wife began to argue as their home life was disturbed as a result of this. (Tri. Tr. 151:1-157:8).  Mr. Perros confirmed that he lost sleep over this. (Tri. Tr. 156:23-24).

22.     Importantly, by not having the weapon, Mr. Perros was wrongfully and discriminatorily denied a benefit to which he was entitled and it put him in danger as he was exposed to inmates he had worked with on the inside with no protection on the outside. (Tri. Tr. 155:20-156:16).  Lastly, Mr. Perros was given a red identification card instead of a blue identification card

which signaled to every officer that saw it that Mr. Perros had done something wrong. This undeserved humiliation ritual added insult to undeserved injury. (Tri. Tr. 157:9-158:24).

**B. Thomas Delle**

23. In Plaintiff's Complaint, Plaintiff Thomas Delle alleged that on or about January 14, 2012, he sustained an injury to his neck and back while on the job, which rendered him injured and or disabled per his doctors opinions. As a result, Plaintiff Delle was unable to perform the physical duties of his employment as a Nassau County Corrections Officer. These injuries to his neck and back were a part of an accumulation of injuries that occurred on the job which included herniated discs in his neck and lower back and knee surgery resulting from a 2008 incident and a C-7 fracture from an incident with an inmate in 2004. However, these injuries did not serve to disqualify him from having his firearms upon retirement. (Complaint ¶¶51, 61, 62).

24. Plaintiff Delle suffered from no mental impairments or disabilities as a result of his injuries. Though he was injured, Plaintiff Delle wanted to work but his doctors and the Nassau County Police Surgeon who were affiliated with the Sheriff's Department eventually recommended that Plaintiff Delle could not work given his condition. Further, the Sheriff's Department did not allow Plaintiff Delle to work a light duty assignment and thus Plaintiff Delle applied for and was granted, Workers Compensation benefits/payments as well as Social Security Disability benefits. Plaintiff Delle ultimately retired on December 5, 2013 and was awarded 3/4 disability as a result of his above stated injuries. (Complaint ¶56).

25. After his retirement, Plaintiff Delle applied for a pistol permit called a "good guy" letter for which his injuries would not have disqualified him. Plaintiff Delle submitted medical proof of the fact that he was capable of carrying and maintaining a firearm, and was still summarily denied

in his application for a pistol permit. The only reason Plaintiff Delle was denied was because of his disability status. (Complaint¶ ¶57, 63, 64),

26.     At the damages trial, Thomas Delle testified that, when he worked for the Sheriff's Department he was a floater and as a result he had a different post every day. There were times during his detail with the Sheriff's Department where he had to carry a firearm on his person, such as transportation, if he was outside, if he was operating patrol vehicles, if he was working in the gatehouse, or if he was at the hospital. (Tri. Tr. 242:13-243:7). Mr. Delle was in the United States Marine Corp prior to his time with the Sheriff. He left the Marine Corp with his DD214 honorable discharge. (*Id.* 243:14-25). When Mr. Delle left the Sheriff's department he received a disability pension as a result of cumulative injuries he received in 2004, 2009, and 2012. At the urging of the police surgeon and the fact that the police surgeon told Mr. Delle he would never be full duty, Mr. Delle "put his papers in." (*Id*. At 244:7-20).

27.     Mr. Delle's Recommendation for Consideration of Application for Pistol License for Retiring Peace/Police Office was entered into evidence as Exhibit 1. (Tri. Tr. 246:13-21). Plaintiff was expecting to see this paperwork when he retired because to him this was the same thing as his DD-214. He considered it to be a career resume at the Sheriff's Department. (*Id.* At 247:4-11). Plaintiff Delle never questioned whether or not he would actually receive a good guy letter. He did whatever he was asked to do. He knew he was in good standing or at least he thought he was. (*Id*. at. 247:12-17). Moreover, Plaintiff's application stated that he is "orthopedically stable to maintain firearms" and that "according to our records, the above named individual is not being treated for, nor is there any indication of a condition or restriction, which would bear upon the applicant's request

for a pistol license." (Plaintiffs' Exhibit 1). Yet, Sheriff Sposato, checked the denial box on Plaintiff's application. (*Id*.)

28.     Moreover, adding insult to real physical injury, after Plaintiff Delle was injured on the job and taken straight to the hospital, a few months later he found he was going on the "rubber gun squad" when medical investigations called him and told him they were coming to take his guns. (Tri. Tr. 256:1-257:20). When they came to take Plaintiff Delle's guns he was retired. (Id at 261:16-18). When Plaintiff Delle learned that he was not getting a good guy letter he understood the Sheriff's Department was telling him that he was "a piece of shit." He was in shock. He could not believe it. He was emotional just thinking about it during the damages trial which exemplifies the extent to which this treatment traumatized Mr. Delle and took a part of his dignity as an officer of the law. (*Id* at 264:4-17).

29.     The good guy letter means a lot to Mr. Delle because he served in good faith. He got his hair cut every day, shaved every day, uniform pressed, shoes shined. He could not have done more. And then he was just told to get lost. He could not believe it. He kept going over this moment in his head - "I can't believe they're calling me garbage." The letter to Mr. Delle is not just about guns. It was about not having faith or trust in him. Its not so much that he can get a pistol permit, its more if you look at all the boxes, he was not under investigation, he did no wrong. Mr. Delle WAS a good guy. He couldn't believe it. (*Id* at 264:24-265:16)(emphasis added).

30.     Mr. Delle could not put this behind him. He would sit there at night and stare at the ceiling and be in disbelief that he got a "dishonorable discharge" after all of the bad things that happened to him. Every single day of the year he was there, he would say no to inmates and they

hated him. Mr. Delle was clear that he went by the rules. And then he was at home thinking "What am I going to do?" (Tri. Tr. 265:17-266:18).

31. Mr. Delle's personal safety was also at risk. He lived by the courts in Mineola and he ran into inmates during his daily life on multiple occasions. After years of service, Mr. Delle had been left outside without a weapon to deter or address real danger. (*Id* at 266:20-272:10). Moreover, he also had the blue background ID that was so embarrassing he tried not to use it. (*Id* at 273:11-19). Mr. Delle changed his routine, he did not go to the Home Depot, he did not go to the Lowes, he stayed to himself. This same man who once rebuilt his brother's house. Mr. Delle's enjoyment of life was changed based on these deprivations. (*Id* at 273:20-274:8).

32. Mr. Delle could not believe the place he worked at all those years had let him down. He followed their order to the best of his ability and they let him down. (*Id.* At 274:19-275:10).

**C. Nicholas Lenochi**

33. In Plaintiffs' Federal Complaint, Plaintiff Lenochi alleged that he was a corrections officer for over 25 years. While on the job Plaintiff sustained injuries to both of his hips, to his lower back and to his right knee which rendered him injured and disabled per his doctors opinions. As a result, Plaintiff Lenoci received Workers Compensation payments and was unable to perform the physical duties of his employment as a Nassau County Corrections Officer. (Complaint ¶71).

34. Plaintiff Lenoci suffered no mental impairments or disqualifying disabilities as a result of his injuries, but in 2011 he did undergo double hip replacement surgery. Despite his surgery and injuries, Plaintiff Lenoci was allowed to maintain his weapon and had a firearm for over a year following his injury. However, when it came time for Plaintiff Lenoci to re-qualify with respect to his firearms training, Defendants refused to allow him to re-qualify even though Plaintiff had

submitted letters from doctors clearing him for re-qualification. Regardless of this, Defendants position was that Mr. Lenoci could not qualify due to some unknown and non disclosed policy in the department. (Complaint ¶74).

35. Eventually, Mr. Lenoci was forced to apply for early retirement on or about July 13, 2013. After Plaintiff Lenoci retired from his employment, he applied for a pistol permit/good guy letter from the Sheriff's Department which would allow him to possess and carry a pistol as a retiree. Although Plaintiff Lenoci was physically capable, he was summarily denied his good guy letter by Sheriff Sposato. (Complaint ¶75, 77, 87).

36. At the damages trial, Mr. Lenoci testified that, he worked with the Nassau County Sheriff's Office for 25 years doing care, custody, and control within the jail itself and he also worked in the tower as a sharpshooter with an AR-15. He also went to the Nassau County Police Department detective course and he graduated from that and was in investigations for several years. (Tri. Tr. 182:11-20). Mr. Lenoci became injured on the job while working the visiting area in 2010. (*Id* at 183:10-16). Mr. Lenoci applied for retirement while out on 207-c after going to numerous Doctors, including the County doctor, who said he could not return. (*Id* at 184:13-25). Mr. Lenoci went out on regular retirement because the injury occurred with a civilian at the time so he was not entitled to three-quarters. (*Id.*)

37. When Mr. Lenoci applied for disability they gave him what he thought was his "good guy letter." But, he was in fact denied him his firearms and he did not understand because according to him his twenty-five years of service had been "perfect". He never had any reports or incidents against him. He was mortified, hurt, and blindsided that Defendants would deny him his good guy letter especially when he was hurt on the job. Especially, when he had been there twenty-five years.

Mr. Lenoci felt it just seemed something was really not right. He felt being a person who had always believe in right and wrong, that this treatment was wrong. Mr. Lenoci wanted to retire with dignity and he felt it was just taken away from him. He expressed that he had a very hard time adjusting to it. It had affected his family life. Mr. Lenoci has been married to his wife for forty-six years, they have four children and every time he put on the uniform and left the door he testified that he was proud. After Mr. Lenoci was denied his good guy letter, he did not want to go out into the community. He could not do anything with his retirement. Mr. Lenoci was even denied a target permit. (Tri. Tr. 185:1-186:20).

38.     Mr. Lenoci was completely humiliated at the precinct because he knew some of these men from the police department. Mr. Lenoci was so humiliated and embarrassed he called Mr. Sposato and Mr. Sposato called him back. Mr. Lenoci wanted to speak to Mr. Sposato about his good guy letter to which Mr. Sposato told Mr. Lenoci "Well, you went out on three quarters." This was not correct. Mr. Lenoci tried to tell Mr. Sposato that he went out on his regular retirement but he understood Mr. Sposato's comment to mean that he was targeting all of the guys who were going out on three quarters. (Tri. Tr. 186:25-188:10).

39.     After this situation with Mr. Sposato, Mr. Lenoci stayed home a lot, he didn't go out. His wife would tell his children "Don't bother dad. He's just having a bad day." Finally, Mr. Lenoci decided to try to get himself out of this and go to a monster truck show because his children love monster truck shows. When he sat down, he heard someone say "Hey! CO!" and all of a sudden Mr. Lenoci was there without his service weapon and with his kids. As he sat there, the former inmates who know Mr. Lenoci begin to sing "I shot the sheriff". Mr. Lenoci was then in a situation, without

his service weapon where he had to watch his back with nothing, absolutely nothing, to protect himself or his children. (Tri. Tr. 191:1-193:12).

40.     The problem was Mr. Lenoci lived in East Meadow one mile from the Correction Facility for over forty (40) years. His wife did not want to leave their home. The community he lives in is the community he was a corrections officer in. Where his daughter was a Girl Scout.  Where his family goes to church. It killed Mr. Lenoci that he could not walk around his own street at night. His wife sat him down and said "I don't want to leave. This is my home." and Mr. Lenoci assured her they didn't have to leave. So, he just never left. His wife did things alone. Until one day, Mr. Lenoci said lets go to home depot. When he got to the home depot, there was an inmate. Mr. Lenoci's first instinct was to blade his body to protect his gun side. But, Mr. Lenoci had no gun. (Tri. Tr. 193:21-196:4). This was a real life situation that had a life altering impact on this man.

**D. <u>Victor Patalano</u>**

41.     In Plaintiffs' Complaint, Plaintiff Victor Patalano alleged that he was employed by the Nassau County Sheriff's Department for 26 and a half years. During Victor Patalano's time with the Sheriff's Department, he served as a Union Vice President and President of the Department Sheriff's Association. On February 17, 2010, Plaintiff Patalano sustained injuries when he slipped on ice and fell on his side while serving a summons. As a result of his fall, Plaintiff Patalano sustained injuries to his knee and to his elbow which rendered him injured per the County's doctors' opinions and he remained out of work for eighteen days but eventually returned. In November of 2011, Plaintiff Patalano was told he would need to undergo a left hip replacement. As a result, in May of 2012, Plaintiff Patalano underwent total hip replacement surgery. Following his surgery, he

was advised he would not be able to return to his employment as a deputy sheriff. Plaintiff was forced to apply for early retirement in April of 2013. (Complaint ¶93, 94, 95, 96, 97, 98, 99).

42. When Plaintiff Patalano retired, he applied for his good guy letter as he had no impairment that would have disqualified him from lawfully owning a firearm or receiving this continued recommendation from the Sheriff's department. Plaintiff Patalano was summarily denied his good guy letter by Sheriff Sposato. (Complaint ¶108).

43. At the damages trial, Plaintiff Patalano testified that in his 26 years as a Sheriff he had been out on the street every single day doing warrants, property executions, Kendra's Law, Evictions, and serving summonses and judgments. (Tri. Tr. 80:15-91:8). Additionally, Mr. Patalano had achieved the Sergeant rank during his time of service. (*Id.*) Plaintiff Patalano's injury and subsequent disability was memorialized in Plaintiff's Exhibit 2A which was ultimately admitted. (Plaintiffs' Exhibit 2A; Tri. Tr. 84:16-20). Plaintiff Patalano's Recommendation for Consideration of Application for Pistol License of Retiring Peace/Police Officer was admitted as Exhibit 2B and his firearms receipt was admitted as Exhibit 2C. (Tri. Tr. 86:2-3).

44. When Mr. Patalano took his letter to the Nassau County Police Department he had not even looked at it really carefully because he knew it had never been denied in his department without a good reason. Once he did look at it and realized it was denied, he did not have any understanding of why it would have been. (Tri. Tr. 89:8-25). Not only did Mr. Patalano work for 26 years as a Sheriff, he had worked in every issue in the department, he even worked in corrections for a year. He received awards when he was on the job. Mr. Patalano was unaware of a reason why he should have been denied. (Tri. Tr. 91:6-17). Mr. Patalano immediately questioned why he was denied and Sheriff Sposato refused to give him an answer. Mr. Patalano left messages with his

secretary and spoke to Captain Golio who said he was going to relay the message, but never got an answer. Continuing to advocate for himself, Mr. Patalano wrote his congressman and the legislature who said there was no reason they saw that he would be denied but they had no authority to do anything as the authority in Nassau County was the police department. Mr. Patalano then wrote the Police Commission, Police Commissioner Crumpter, who responded and said he didn't have any reason he should be denied but that he could not give him a retired Police Officer's Permit because of what the sheriff wrote. (Tri. Tr. 90:1-91:4). Moreover, Captain Golio had written a letter in support of Plaintiff stating that Plaintiff was denied because of his disability. (Tri. Tr. 94:1-4).

45. Being denied his good guy letter made Plaintiff Patalano feel like "garbage" and begin to question what he did wrong, although he did nothing wrong. He was embarrassed. This affected him whenever he would talk to another police officer and they would question what he did wrong to not get his good guy letter because the practice had always been that the day you retired you got your good guy letter. (Tri. Tr. 91:18-92:8). Having a good guy letter was also important to Plaintiff because he had done his job for 26 years, he had not done anything wrong, and he had to go into public and run into people that he had arrested, evicted, vacated from their homes on orders of protection, and people that have mental disabilities so he was a target on the street. (Tri. Tr. 92:21-93:9). Further, Plaintiff's fears came to fruition when he was at Target and he was walking around the store with his grandson and someone he had arrested on a Kendra Law was following him and his grandson around the store. Plaintiff left Target because he wanted to make sure nothing happened to him. (Tri. Tr. 93:11-25).

46. This treatment made it evident that he was a victim of a clear act of discrimination. Plaintiff Patalano had his weapons the whole time he was out on disability and when he filed for

retirement he had to turn his firearms over to the jail. (Tri. Tr. 94:11-20). Plaintiff then didn't feel comfortable even around other officers without his weapon because it just made him look like he had done something wrong, even when he hadn't. (*Id*. 94:25-95:10). Plaintiff not having a good guy letter made him feel ashamed. He could no longer even look at guns in a gun store he used to frequent because he did not have his permit. (Tri. Tr. 98:4-19).

47. Moreover, Mr. Patalano was denied the opportunity to apply for positions that he had wanted to apply for in his retirement such as armed security. (Tri. Tr. 132:5-20). Mr. Patalano was willing to work and unable due to the fact he did not have his firearm. (*Id.*).

48. Mr. Patalano also no longer had the deterrent if he saw someone he had arrested out in public. So, he was always extra cautious. He was always worried about his family when he was with them, especially his grandchildren. Not having his good guy letter, and thus his weapons, changed his entire way of thinking. (Tri. Tr. 102:2-103:5). Notably, the exact reason Plaintiff was devastated by the loss of his good guy letter is exactly why he did not seek counseling. He explained: because if you are a law enforcement officer its not a good thing to get counseling and a doctor or a therapist can pull your firearms. Plaintiff was so worried he would not be able to get his good guy letter or his permit he did not seek help for what he felt. (Tri. Tr. 103:6-22).

**E. Ronald Lanier**

49. In Plaintiffs' Federal Complaint, Plaintiff Ronald Lanier alleged that he was employed by Defendant County of Nassau as a correction officer within the Nassau County Sheriff's Department for twenty two (22) years. While handling a violent inmate, Plaintiff Lanier sustained an injury to his neck on the job which rendered him injured and/or disabled per his doctors' opinions.

As a result, Plaintiff Lanier was unable to perform the physical duties of his employment as a Nassau County Corrections Officer. (Complaint ¶ 114, 115).

50.     In or around September 2012, Plaintiff Lanier applied for early retirement, which was granted and he retired on 3/4 disability. After Plaintiff Lanier retired, he applied for his pistol permit/good guy letter from the Sheriff's Department. On or about October 2012, Plaintiff Lanier's application for pistol privileges was unbeknowst to him, summarily denied by Defendants. Thereafter, November 6, 2012, Plaintiff Lanier appealed this decision because among other things, he believed that his denial was an error or a mismarking on the letter by the Department. By letter dated November 14, 2012, Defendant SPOSATO sent Plaintiff LANIER a letter wherein he indicated, inter alia, that "*your ability to possess firearms was restricted as a result of the injury that culminated in your disability retirement.*" (Plaintiffs' Exhibit 5E). Sheriff Sposato also clarified that there was no error made by the Department on the application. (*Id.*) This letter was evidence which provided Plaintiff Lanier, for the first time that he was being discriminated against based on his disability and retirement as a disabled Corrections Officer. (Complaint ¶ 116, 119, 120, 123).

51.     Defendants summarily denied Plaintiff's application for a pistol permit and/or Plaintiff's application for a "good guy letter," which Plaintiff Lanier required in order to obtain a firearms license. The only reason that Defendants denied Plaintiff's application is because of Plaintiff's injuries, disability, and the fact that Plaintiff retired while injured and suffering from physical disabilities (Complaint ¶ 129, 130).

52.     At the damages trial, Ronald Lanier testified, that during his time with the Sheriff's Department he worked in the towers and his last post was the visiting room. (Tri. Tr. 302:13-16). Mr. Lanier was in the United States Army prior to working in the jail wherein he received an

honorable discharge. (*Id.* At 306:14-21). Plaintiff Lanier's DD-214 was admitted into evidence as 5G. Plaintiffs Recommendation for Consideration of application for Pistol License for Retiring Peace/Police Officer was admitted into evidence as 5A. It notes that Plaintiff's firearms were previously restricted, but that according to their records, the above named individual is not being treated for, nor is there any indication of a condition or restriction, which would bear upon the applicant's request for a pistol license. Additionally, it notes that Mr. Lanier is not under investigation at this time. It further notes, there are no impediments, conditions or restrictions which would bear upon the applicant's request for a pistol license. (Id. At 310:6-14). Yet, Sheriff Sposato checked the box to not recommend consideration of Plaintiff's application. (Plaintiff's Exhibit 5A).

53. 5A is Plaintiff's so called "Good Guy letter. To Mr. Lanier a good guy letter symbolized the last stage of getting out and getting his gun privileges as retired. It showed, to him, that he did everything he was supposed to do as a Sheriff or as a corrections officer and that he took an oath to protect the safety and security of the jail. This document to Mr. Lanier was not just about guns. (Tri. Tr. 310:20-311:8). Mr. Lanier was so proud of his service in corrections that when he received his good guy letter he did not open it. He knew nothing was going to be denied in the envelope. When he showed up to the Nassau County Police Department and he was denied he was shocked. (*Id*. At 312:1-13). Plaintiff Lanier's response to being denied was "Are you fucking kidding me?" he was hurt, he was like you gave me this gun to protect and serve your department and then when you release me "you feed me to the wolves" without protection for all the people that I watched incarcerated. (Id at 312:14-313:9). When Plaintiff learned that he was denied, he was proactive about his situation and got an attorney to write a letter to the department to state he was in good standing. (Tri. Tr. 313:10-15). Further, Plaintiff had met the training standards by going through all of the

training, going through the academy, going through recertifications every year. In fact, Mr. Lanier's application stated Mr. Lanier was current on his training. (Id. At 314:8-21, Plaintiffs' Exhibit 5A).

54.     Plaintiff submitted a memo to Mr. Sposato's office stating that he had an application for his pistol license which was denied. This memo was admitted into evidence as Plaintiff's Exhibit 5C. (Tri. Tr. 317:7-12). The memo stated, "in consulting with my attorney, he reviewed the application and noticed that what looks like to be an error upon you signing the application. You signed off on both boxes. He advised me to write a letter advising of the error for correction. For your reference, I've attached a letter from my doctor stating that my medical prognosis does not prevent me from carrying and safeguarding my firearm." (Id. At 319:11-22). Plaintiff wrote this because he wanted to get clarity of what was going on. (Id. At 319:23-320:2). Plaintiff received a response to this letter which was admitted into evidence as Plaintiffs' Exhibit 5E. (Id. At 320:10-14; Plaintiff's Exhibit 5E). The response letter, marked 5E, confirmed that this was not an error and was signed by Michael Sposato. (Plaintiffs' Exhibit 5E). At the point of receiving this response, Plaintiff Lanier felt betrayed and that his hands were tied. It bothered him for some time because he was looking forward to retiring in good grace. In his mind, he wanted to complete his mission, complete his assignment. He had given his life to the jail and now he had this blemish on his record solely because of the signature of Sheriff Michael Sposato. It was clear that everything else on the good-guy letter, from this department, from internal affairs, from medical, was okay. It was only Michael Sposato, acting for the whole department who had denied him. (Id at. 322:16-323:4).

55.     After this letter, Plaintiff Lanier got exhausted. The denial at the Police Department was a blow to Plaintiff. It was a huge disappointment. He went home to confide in his mother about it. He expressed that it was not a good feeling. He had given 22 and a half years to the Sheriff's

Department and this was all he had known. He had taken an oath to protect and serve and he thought he did a good job. (*Id* at 323:14-324:10).

56. Moreover, Plaintiff was concerned about contact with people from the jail and having a firearm would have made him feel some form of security. (Id. At 324:11-19). This concern was a real concern as evidenced by the assault on Mr. Lanier's twin brother Donald Lanier who had his face slashed with a razor. It was the position of the prosecution in the criminal case that the assailant actually intended to assault Officer Ronald Lanier but did not realize he was assaulting Mr. Lanier's twin. In light of that, the reality of threat to Mr. Lanier's life had remained a regular consideration. This was memorialized in Exhibit 5D which was entered into evidence. (Plaintiffs' Exhibit 5D; Tri. Tr. 324:19-25). Plaintiff Ronald Lanier's identical twin brother, Donald Lanier, received 54 stitches in his face as a result of this attack. (Tri. Tr. 325:11-326:7). After this assault on Mr. Lanier's twin brother, who suffered in place of Mr. Lanier, Mr. Lanier had every right to believe the Department would do right by him and give him his good guy letter. (Id. At 326:20-24). No such consideration stood in the way of Sposato's clear agenda of engaging in discrimination.

57. Moreover, Mr. Lanier also received an ID card with a blue background. As a result, he became an introvert. He felt as though he did not want to be connected to the department anymore. The red background to Mr. Lanier was retiring with pride and dignity and that was taken from him. (Id. At 326:25-327:12).

58. Additionally, the denial of Mr. Lanier's good guy letter cost him other opportunities in life such as the opportunity to work with celebrities like Sexy Red, Keith Sweat, Boys II Men as a bodyguard or security. It hurt Mr. Lanier that he could not do security and he did not want to talk about the fact that he did not have his gun because the people who had wanted to hire him knew

what he had been doing for a living. It was hard for Mr. Lanier to sit there and be offered positions to do part time security and not even be able to touch it. (Tri. Tr. 336:22-338:10).

59. Mr. Lanier was not a gun buff. He had one weapon. He protected and served the safety and security of the jail and all he wanted was the same when he got out. He wanted to be safe when he got out with a weapon like he had been safe in the jail with his weapon for 22 years. Respect was important to Mr. Lanier, he kept his uniform up, he shaved, he kept his shoes shined. He took pride in his uniform. And when it was time for him to leave and that good guy letter was denied, his question to himself was what was it all for? Mr. Lanier felt used. (Tri. Tr. 327:13-328:10).

60. From 2012 to 2023, Mr. Lanier had no protection. He had to stay vigilant wherever he went. He always had to look over his back. He always sat by a window. If he had his kids, he sat where he could see the exits. Living with this on his mind was disappointing. Mr. Lanier loved going to work. He loved serving Nassau County. He gave his life to the Department. (Id. At 329:7-330:11). His sense of being betrayed loomed large in his life. The feelings Mr. Lanier has about not receiving his good guy letter will never go away because it was something he earned and was denied. (Tri. Tr. 336:22-338:10).

**F. Ibrahim Zahran**

61. In Plaintiffs' Complaint, Plaintiff, Ibrahim Zahran, alleged that he was employed as a corrections officer for 23 years. During his time with the Nassau County Sheriff's Department, Plaintiff Zahran was injured when he attempted to stop two inmates from engaging in a fight with one another. While attempting to separate the inmates, he, along with the inmates and the other officers fell to the floor and they fell on top of him. Plaintiff suffered physical injuries, including an

injury to his knee and to his lower back and had to be removed by wheel chair. As a result of this interaction with the inmates, Plaintiff Zahran sustained a tear in his meniscus, as well as injuries to his ankle and back and herniated and bulging disks. This rendered Plaintiff disabled per the county and his doctors opinions. Plaintiff Zahran remained out of work as a result and  applied for ¾ disability as his injuries were severe enough to prevent him from returning to work at the Corrections Center. (Complaint ¶¶ 136, 137, 138, 139).

62. At the time, Plaintiff then applied for retirement from his employment and his good guy letter. Plaintiff's application was summarily denied by Sheriff Sposato. Sheriff Sposato's sole reason for denying Plaintiff's application was due to Plaintiff's disability status at the time of his retirement. (Complaint ¶¶ 142, 143).

63. At the damages trial, Plaintiff Zahran's incident report regarding his injury was admitted as Exhibit 4A. (Plaintiff's Exhibit 4A). Plaintiff's 207-C letter was admitted as Exhibit 4B. (Plaintiff's Exhibit 4B).  Plaintiff Zahran testified that the County ultimately made the decision for him to retire as a result of his legs being two different sizes. (Tri. Tr. 34:17-35:17). It was decided that Plaintiff Zahran was disabled and could not return to work. (*Id.*) Mr. Zahran's Recommendation for Consideration of Application for Pistol License for Retiring Peace/Police Officer was then entered in as Plaintiff's Exhibits 47 and 48. (Tri. Tr. 36:10-15).  Plaintiff's application clearly states that he is "capable of carrying and possessing his firearm" and then the box indicating that "according to our records, the above named individual is not being treated for, nor is there any indication of a condition or restriction, which would bear upon the applicant's request for of a pistol license" is checked. (Plaintiffs' Exhibit 47).  Yet, Michael Sposato denied Plaintiff his pistol license. (Plaintiffs' Exhibit 48).

64.     As a result of Plaintiff's denial for his "good guy letter", his guns were ultimately taken. (Tri. Tr. 39:21-40:2). In fact, Plaintiff Zahran had all six of the weapons he owned taken as a result of this denial. (Tri. Tr. 41:5-8).  A good guy letter to Mr. Zahran was a representation of how a person carries themself in society. It was a confirmation of the fact they could be an asset. (Tri. Tr. 42:5-11).  When Plaintiff Zahran realized he was denied his good guy letter he was taken back, he was in shock. He had been a member of the honor guard. He expressed that he did everything he could do for the department. The denial of his good guy letter was like a "hot poker" stabbing into his stomach. "It was a gut punch." He had never experienced anything like this before in his professional life. (Tri. Tr. 43:10-22).

65.     Additionally, Plaintiff became concerned for himself and for his family, specifically his wife and his daughter. He knew that there were people who had been incarcerated who did not particularly care for him. He knew that he had a unique last name and that it would stand out putting them all in danger he could not protect them from. (Tri. Tr. 44:1-21). The denial was even more shocking to the Plaintiff because Plaintiff had been honorably discharged from the military so when Sheriff Sposato denied his weapons he was floored. (Tri. Tr. 45:12-20). Plaintiff, in an effort to advocate for himself, went to speak with Sheriff Sposato to find out why he was denied and Sheriff Sposato refused to speak with him. (Tri. Tr. 47:18:-48:6). This was particularly noteworthy because Plaintiff had met Sheriff Sposato on a few occasions. But, when Sheriff Sposato denied the meeting, Plaintiff went to the Sheriff's Bureau of Investigation's to inquire further. The Sheriff's Bureau of Investigations did not understand why this was happening to Mr. Zahran. (Tri. Tr. 48:10-49:8). Plaintiff Zahran felt betrayed because for all the things he did in the Sheriff's Department he ultimately deserved to be considered a "good guy". (*Id.*)

66.     Plaintiff was given a blue background instead of a red background on his identification card and it signaled to everyone that he was a "scumbag" which for Mr. Zahran felt awful. (Tri. Tr. 51:1-18). Not having his good guy letter made Plaintiff Zahran feel as though everything he did for the Sheriff's Department was for nothing. All the awards, all the certificates, outweighed by this stain on his reputation. (Tri. Tr. 53:3-17). Moreover, it was embarrassing to show his blue identification card to other officers. (Tri. Tr. 53:18-54:1).

67.     To make matters worse, when Mr. Zahran left the military he, like his co-plaintiffs, got an honorable discharge, expert rifle, expert grenade, expert pistol. He left good. When he got his "bad guy letter", to him it was like getting a dishonorable discharge. (Tri. Tr. 54:2-14). Plaintiff felt like he had been slapped in the face for a stretch of time, that it was saying he can't have anything, he wasn't worth anything, he was garbage. (Tri. Tr. 54:22-55:2).

**Sheriff Sposato**

68.     Defendant Sposato started his career in the jail as a correctional center cook one, cooking for the presently incarcerated. (Tri. Tr. 404-406).  After ten years as a cook one,  Mr. Sposato became a kitchen supervisor for approximately six months and then went from kitchen supervisor to Undersheriff in the Sheriff's Department. (*Id.* at 409:23-410:11).  Sheriff Sposato had never been in the military, had never been a peace officer, and had never been a police officer. (*Id.* At 412:15-20).  Sheriff Sposato had taken tests to become a police officer and a corrections officer and was never appointed. (*Id.* At 413-414). In fact, his prior experience before working in the jail was working at the sewage treatment plant in the Town of Oyster Bay. (*Id* at 414). Notably, prior to his tenure as Sheriff, Sheriff Sposato had been arrested from the jail one time. (*Id*. At 416-417).

69.     Further, Sheriff Sposato has as limited a history with firearms as he does with law enforcement. He never had a firearms permit absent being given a service weapon in his appointed position. He left the firearms he did own at the jail. He never had an application in for a firearm. He has never had to go through a full application process for a firearm. He ultimately signed over his guns to members of the Sheriff's training staff and prior to that he had only gone to the range one time to qualify in the six to seven years he actually had a gun. (*Id* at 417-420.)

70.     In spite of this, Sheriff Sposato was aware of the fact that 207-C only applied when a person was injured in an inmate altercation and it resulted in a change of retirement status and the person going out on three quarters disability. (*Id* at 422-423). Sheriff Sposato's position at the damages trial was that a person who is out on 207-C disability was not allowed to qualify for their gun. (*Id* at 426:5-7). It was also clearly established at the damages trial that Sheriff Sposato does not know the working rules for 207-C disability. Sheriff Sposato stated his medical investigations unit would be the person who would know and that he would not know every single exception if one existed. (*Id* at 427-428.)

71.     Defendant Sposato was aware of what a "good guy letter" was and that there was no other document that was utilized concerning a persons status when leaving the job. (*Id.* At 432). The good guy letter provided Defendant Sposato the opportunity to make a determination on whether someone would ultimately be recommended for consideration for a license application. (*Id*).

72.     Notably, Sheriff Sposato admitted that he knows the Plaintiffs in this action and had worked with them at one time or another in his capacity as Sheriff or Undersheriff or cook. (Id at 428). Specifically, Sheriff Sposato was shown the good guy letters for specific Plaintiffs. First, Sheriff Sposato was shown the good guy letter for Nicholas Lenoci (Tri. Tr. 433; Plaintiffs' Exhibit

6A). Defendant Sposato stated that Mr. Lenoci could not qualify because Mr. Lenoci was out on 207-C disability and that Plaintiffs could have qualified on their own but they "just don't qualify them" if "they're out." (*Id.*). Next, Mr. Sposato was shown the good guy letter of Ronald Lanier. (Id. At 435; Plaintiffs' Exhibit 5A). Mr. Sposato denied Mr. Lanier's application as he did not make the recommendation for Mr. Lanier to have a pistol license. Importantly, Mr. Lanier qualified and had supporting medical documentation stating he was capable of carrying his firearm and this was noted on his application and was readily available to Defendant Sposato when he was issuing his determination. (*Id.* At 436-444). Defendant Sposato also knew Mr. Ibrahim Zahran and denied him a pistol permit. (*Id* at 444-445). Mr. Zahran also submitted supporting medical documentation stating he was capable of carrying a firearm which was noted on his application and this information was readily available to Defendant Sposato when he was issuing his determination. (*Id* at 446-447). Defendant Sposato stated that Ibrahim Zahran could not qualify because he was out on 207-C. (*Id.*). Defendant Sposato also knew Mr. Perros and Mr. Perros' wife. Defendant Sposato denied Mr. Perros' application for a pistol license. Mr. Perros also submitted medical documentation supporting that he was medically capable of owning a firearm which Defendant Sposato summarily ignored. (Tri. Tr. 448, 453). Defendant Sposato denied Mr. Patalano's application even though he was qualified because he was out on restricted duty. (*Id* at 483).

73.     Defendant Sposato does not know how long any of the Plaintiffs served. He never had to lock someone up. He never had to face someone in the street that wanted to hurt him because of what he did to them while they were in jail. He knew that the men he was denying were going out into the world without a gun and without his recommendation. (*Id.* At 456-457). Yet, it was Mr. Sposato's position that a person who was on disability could not go to the firearms range because

they could not qualify if they were on disability. (Id at 459). Their firearms are taken and they remain at the training facility. (*Id.* at 459-460). Mr. Sposato "assumed" that the letters from the doctor provided by Mr. Lanier were taken into account but he "never really" got "into that" because he was briefed "on the form itself." (*Id.* at 464-465). Mr. Sposato considered restrictions an issue and doctors an issue. (*Id* at 470). Mr. Sposato denied no member of the Department who retired on regular retirement and always granted their good guy letters to them. (*Id* at 475).

74.     Defendant Sposato was the decision maker. Defendant Sposato was with whom the "buck stopped." Defendant Sposato was the person who made the decision to deny these men their good guy letters. Although he initially attempted at the trial to claim it was based on policy Defendant Sposato did not know if there was a written policy that stated to deny officers because they have a disability. (*Id* At 490-491). Defendant Sposato assumed that the police department factored in his recommendation into other types of pistol permits. (*Id* at 497).

### QUALIFICATIONS OF FREDERICK K. BREWINGTON

75.     As noted, I am the named Principal in the Law Offices. The majority of the cases I handle in federal court involve claims of police misconduct, employment discrimination, housing discrimination, Voting Rights, Environmental Justice and Education Discrimination law.  For the most part on these cases, the Law Offices represents plaintiffs.  We have represented Defendants in cases raising important social, equity, and/or racial injustice issues.

76.     I am a member of the bars of the States of New York and New Jersey, the Eastern, Southern and Northern  Districts of New York, and the District of New Jersey. I am also admitted to the Second and Third Circuit Courts of Appeal, and the Supreme Court of the United States.

77. I have practiced extensively in the area of federal civil rights law, and have been engaged in the litigation of complex civil rights law matters in this Court, the Southern and Northern Districts of New York, the Second Circuit Court of Appeals and the United States Supreme Court. I have participated in well over 450 federally reported cases and over 50 New York State reported cases.

78. I am a 1982 graduate of the Northeastern University School of Law, where I was chosen by my classmates to represent them on governance issues, and chosen by my peers to deliver the student commencement address. Since interning with the United States Legal Counsel's Office in Washington, D.C. and the Center for Constitutional Rights in New York, I have been regularly involved in litigation matters as an intern, law graduate, and attorney. Since 1987, I have run my own practice. The following are just examples of cases that illustrate the level of experience that I possess as a litigator and specialist in the area of civil rights laws:

» **Goosby, et al v. Town of Hempstead, 88-CV-2453 (JG) (EDNY); 956 F.Supp. 326, 1997 WL 74399; 981 F.Supp. 751, 1997 WL 655890; 180 F.3d 476, 1999 WL 427446; 528 U.S.1138, 120 S. Ct. 982 (1/24/2000)**

Class Action commenced under the Voting Rights Act of 1965 challenging the 80 year discriminatory process of selecting Town of Hempstead council members which systematically prevented the election of candidates of choice by members of the Town's African American population. The action sought to dismantle the at-large voting system in the largest township in the United States and have it replaced with a councilmanic district system of electing town board members.
Results: After trial Plaintiffs' verdict rendered and then affirmed by the Second Circuit. Council District formed by order of the Court and elections held.

» **Eunice Davis v. County of Nassau, et al. 88 CV 2144 (EDNY)**

42 U.S.C. § 1983 Police Brutality action in which police beat plaintiff and then transported him across the New York City border into Brooklyn, where they forced him out of their car and abandoned him.
Results: Settled. No decision.

»  **Benjamin v. Clarklift of New York, et al.**  **Index No. 112208/86 (Bronx Sup. Ct.) (Gonzalez, J.)**

Wrongful death, products liability case involving a tow motor accident at a New York City sewage treatment plant.
Results:  Jury verdict of $2,800,000.00. Settled $1,220,000.00

»  **Petition to the United States Justice Department for Monitors in NYC Mayoral Election November, 1989**

Part of a legal team from the Center for Constitutional Rights which made a Voting Rights petition to the United States Justice Department requesting observers at polling places in Manhattan, Bronx and Brooklyn in the Mayoral election bid of David N. Dinkins.
Results:  Petition granted. No decision.

»  **Steele v. Malverne Union Free School District 89 Civ 2515 (RR)(EDNY) Filed July 31, 1989**

Employment Discrimination lawsuit on behalf of a teacher in the Malverne School District, the same district which served as the test case for school integration in Nassau County.
Results:  Settled-No decision

»  **NAACP v. Board of Elections 90 CV 0306 (Sifton, J.)(EDNY)**

Co-counsel in Voting Rights lawsuit, challenging the purge of minority voters from the voting rolls in Nassau County. Action was based upon the fact that minorities were purged at a rate twice that of non-minorities.
Results:  Injunction issued to stop purge. The purging law was then changed by the N.Y. State Legislature.

»  **Herbert McGraw v. City of New York, et al. (SDNY)**

Police Brutality case invoking 42 U.S.C. § 1983, brought on behalf of a homeless man in a city shelter.
Results:  Settled: $60,000.00

»  **Estate of Jimmy Lee Bruce v. Middletown, 88 Civ. 1846(GLG)(SDNY)(Goettel) 1988 through May 1992**

Police Brutality/Wrongful Death action, invoking 42 U.S.C. §1983, involving the wrongful use of a choke hold by an off-duty police officer.

Results: As part of the settlement, a Federal Judge ordered the Middletown police department and town officials to enter into a dialogue with leaders of the Town's Black community.

» **People v. Sherman Manning, Sr., Barbara Manning and Nolan Manning Family Court, Suffolk Docket No. 69-71/91 and Grand Jury Suffolk County 1990-1991**

Criminal Charges of felony assault, harassment, reckless endangerment in a bias incident involving the Mannings (a Black family) and a white family. Trial of assault charges against Nolan Manning resulted in acquittal.
Results: All charges dismissed. No decision.

» **Dash v. Equitable Life Insurance, 87 CIV 2804 (RR), 753 F.Supp. 1062 (EDNY, Dec. 21, 1990)**

1987-1991 Employment Discrimination action invoking 42 U.S.C. § 1981 and Title VII. Then District Judge Reena Raggi wrote a decision carving out exceptions under Patterson v. McLean, 109 S.Ct. 1362 (1989), thus distinguishing the promotion issue in Dash.
Results: Settled.

» **People v. Robinson and Robinson v. Village of Rockville Centre, et al. 93 CIV 2696 (ILG)(ETB)(EDNY) 1992 through October, 1995**

Criminal trial ending in acquittal. Subsequent False Arrest/Police Brutality/Excessive Force action invoking 42 U.S.C. § 1983. After jury trial, verdict for plaintiff for $443,725.00
Results: Criminal Charges dismissed, Plaintiffs verdict and Matter eventually settled without appeal.

» **Victor Snell v. Roslyn Harbor, et al. CV 94-5875 (ADS)(EDNY) 1994-1996**

42 U.S.C. §§ 1983, 1981, 14th Amendment law suit by African-American security guard who was terminated from his job after asking the mayor's wife and daughter to move their illegally parked cars.
Results: Case settled

» **Portee v. Hastava, et al. CV 90-1796 (SM) on appeal: 94-7988/95-7982(XAP), 853 F.Supp. 597(EDNY July 7, 1994) 1990-1996**

Fair Housing, housing discrimination lawsuit brought by inter-racial couple and their child due to the defendant's refusal to rent them a house in Island Park, New York. Two trial, and appeal to the Second Circuit.

First jury's damages award ($330,000.00) was ruled excessive by Court, and a new trial was ordered solely on the damages issue. Second jury's award upheld upon appeal.
Results: Settled after appeal.

» **Bloomfield v. Town of Hempstead, et al. CV 91-2554 (EDNY C.Brient[sitting by designation])1991-1993**

Title VII, 42 U.S.C. §§ 1981, 1983 Employment discrimination action by Black Jamaican immigrant who was passed over for promotions and paid less than white counterparts.
Results: Full trial ending in plaintiff's verdict of $123,000.00

» **Darryl Dodson v. City of New York Index No. 10040/86 (Kings Cty. Sup. Ct., Dowd, J.)**

42 U.S.C. § 1983-Wrongful Death action, in which unarmed African-American plaintiff was shot and killed by white police officer while returning from a job interview in Brooklyn, New York.
Results: Settled during jury selection.

» **Dyer v. County of Suffolk et al. 95 CV 0756(TCP)(EDNY), 99-9255 (2nd Cir. Appeal) 1995-2004**

Woman/African-American police officer sued Suffolk County Police Department for race and gender discrimination, pursuant to Title VII and 42 USC § 1983. After jury trial hung jury. Defendants filed post trial motion to dismiss which was denied and then filed appeal seeking dismissal of some of the claims.
Results: Appeal denied and case settled prior to retrial.

» **Atkins v. City of New York, et al. 91 CV 2465, (ARR)(EDNY), 143 F3d 100(2nd Cir. May 5, 1998) 1991-1999**

Action against NYC police officers for use of excessive force and false arrest. Jury verdict in favor of plaintiff for $1.00 despite physical injury and incarceration. Verdict appealed and remanded fo
Results: Case settled after jury selection for second trial before visiting Judge Wolle.

» **Estate of Christopher Wade, et al. 97 CV 1495(JS)EDNY)**

Section 1983-Wrongful death case against County of Nassau and NCPD for the shooting death of Christopher Wade. Partial motion for summary judgment denied. Nine week trial held November 2000 to January 2001 and thirteen (13) days of jury deliberation.
Results: Plaintiff's verdict $2,250,000.00

» **Estate of Chris Jackson, et al. 99 CV 3588(EDNY)**

Section 1983-Wrongful death-Medical Malpractice case against the Nassau County Medical Center and Nassau County Correctional Facility for the death of detainee Christopher Jackson who was a sickle-cell sufferer. Allegations of failure to render care and provide proper care in violation of Mr. Jackson's rights.
Results: Plaintiff's verdict and matter settled during post trial proceedings pending.

» **Leslie v. County of Suffolk 98 CV 7781(EDNY)(Wexler)**

Suffolk County Police Officer denied promotion and transfer alleges race discrimination and violation of constitutional rights under Title VII and 42 USC § 1983.
Results: Case settled during trial.

» **Morris, Merrit, McCall and Williams v. Northrop/Grumman 95 CV 3335(ADS)(EDNY),37 F.Supp.2d 556 (EDNY FEB. 17,1999) and Williams before the NYSDHR 1995-2000**

African-American employees of government contractor sued for discrimination in promotion and termination.
Results: All cases settled to the mutual satisfaction of all parties.

» **People v. Toombs 97Q033123(Blackburn, J.) Queens Crim. Ct., Toombs v. City of New York 98 CV 4779 (NG) (EDNY) 1997-2004**

Eighteen year old African-American woman arrested, charged and beaten by NYC police officer. Ms. Toombs suffered broken nose and lacerations including lacerations requiring sutures in her lip. After trial of criminal charges Ms. Toombs was acquitted by Judge Laura Blackburn (written decision).
Results: Full acquittal on criminal charges. In the Civil Suit the case settled prior to trial.

» **Wolther and Dixon v. Century Operating Corp. et al., 99 CV 5695(EDNY) 1999-2004**

Housing discrimination case commenced by White owner of cooperative shares and African-American Woman to whom he sought to rent the apartment, against local Nassau County coop board and managing agent for denial of rental right.
Results: Probable cause finding by NYSDHR and Federal action resulted in settlement during trial.

» **Boylan v. County of Nassau, et al. 99 CV 3031(EDNY) 1999-2004**

Section 1983 claim of false arrest, malicious prosecution by Nassau County Police Department and brutality against the Nassau County Sheriff's Office and officers by man suffering from Parkinson's disease. He suffered a fractured skull and other serious injuries while in the custody of Correctional officers and was falsely accused of a crime.
Results: Criminal charges were dismissed and civil case ended with $1 million dollar settlement during trial.

» **Werring v. SUNY Farmingdale, et al., 98-CV-5248 (ETB) 1998-2000 (EDNY)**

Section 1983, Title VII case in which the Rev. Edward J Werring, Ph.D. (a Catholic Priest) was retaliated against by college officials after serving on a committee designated to review and evaluate the charges of discrimination made by an African-American professor, and finding discrimination.
Results: After four (4) days of trial, the jury awarded the plaintiff $201,700.00.

» **Smith v. County of Nassau, et al., 97-CV-3908(DRH) (1997-2000)(EDNY)**

Suit by young African-American male (minor) who was taken off his bicycle by Nassau County Police officers, arrested and beaten in front of civilian witnesses.
Results: After jury trial before Hon. Denis R. Hurley, the jury awarded the plaintiff $45,000.00 in compensatory damages.

» **Edmondson v. County of Nassau et al., 03-CV-1025(JS)(ETB)(2003-2006)(EDNY)**

Suit by former County employee with learning disabilities, charging discrimination in employment, wrongful termination and other claims.
Results: After a denial of Defendants' Summary Judgment motions, case settled.

» **USA v. Conor Cash, 01CR0169(TCP) 2001-2004 (EDNY)**

Conor Cash was charged with conspiracy to commit arson, aiding and abetting arson, and providing material support to terrorists.
Results: Following a full jury trial, Mr. Cash was acquitted by a jury on all counts of the Federal Indictment.

» **Scotti v. County of Nassau, et al., CV 02 3685 (TCP)(ARL) 2002-2007 (EDNY)**

Edmund Scotti, a former Nassau County Corrections Officer sued his employer for disability discrimination and retaliation.
Results: After jury selection, the case settled for the amount of $87,500.00 and equitable relief including the issuance to Plaintiff of his badge.

» **People v. Cruz and Cruz v. Henry Modell & Company, et al., CV-05-1450 (AKT) (EDNY)**

42 U.S.C.§ 1981, false arrest and assault claims in which Plaintiff, an African-American women, sued Modell's and its manager for false arrest and discrimination. Plaintiff was prosecuted in the Riverhead Town Court.
Results: All criminal charges were dismissed. Following a full jury trial, the jury awarded the Plaintiff $488,004.72, finding that Defendants Kellerman and Modells violated the rights of Ms. Cruz and were liable under both Federal and State claims.

» **Zellner v. State of New York, et al., CV-02-0095 (SLT) 2002-2008 (EDNY)**

Eastern District of New York Jury trial which found that Mr. Zellner had been falsely arrested, maliciously prosecuted and subjected to other violations of his Civil Rights on February 25, 2000. Jury awarded Mr. Zellner $80,000.00 in compensatory damages as well as punitive damages against the individual Defendants for the egregiousness of their conduct. Post trial motions were filed by Defendants and the matter was then dismissed, the Second Circuit Court of Appeals reversed the dismissal, reinstated the verdict and remanded for attorney's fees and costs.
Results: Matter settled just prior to the submission of full brief on attorney's fees for $298,000.00.

» **People v. John White, INDICTMENT NO: 02662A-2006 (Judge Kahn) (Suffolk County)**

Criminal trial in Suffolk County Criminal Court, where an African American man was charged with Manslaughter in the Second Degree and Weapons Possession for the accidental death of a young White teenager who came to his home at 11:30 p.m. with group of other young men using racial slurs, threatening him and his family and claiming that they were going to beat his son.
Results: People's verdict on December 23, 2008.
Following sentencing and imprisonment of Mr. White, Governor David Paterson commuted the sentence and Mr. White was freed.

» **Tardd v. Brookhaven National Labs, et al., CV-04-3262 (ADS)(ARL) 2004-2008 (EDNY)**

Discrimination and retaliation suit brought by African-American man employed by Brookhaven National Laboratory alleging hostile and improper treatment while on the job.
Results: After three weeks of trial, and only two defendants being called by Plaintiff, case settled to the mutual satisfaction of the parties.

» **Dorsett (Estate of Bird) v County of Nassau, et.al., Docket No.: CV-10-1258 (ADS)(AKT)(EDNY)**

Plaintiff contended that the COUNTY DEFENDANTS allowed Defendant LEONARDO VALDEZ-CRUZ to continue to stalk, menace, torture, harass, annoy, injure, kidnap, physically and verbally threaten, physically and verbally endanger the life and well-being of Deceased Plaintiff JO'ANNA BIRD who had a valid Order of Protection that Defendants failed to enforce. Plaintiff properly filed the instant Complaint against Defendants on March 19, 2010, seeking damages and equitable relief for injuries suffered due to twelve (12) causes of action perpetrated by the Defendants. Plaintiff brought this action against Defendants for committing acts under color of law and depriving plaintiffs of rights secured by the Constitution and laws of the United States and the State of New York for violations of the Plaintiffs' rights, brought pursuant to federal statute 42 *U.S.C.* § 1983, and state causes of action for negligence, gross negligence, abuse of process, wrongful death, assault, battery, and false imprisonment, loss of consortium and parental care, negligent infliction of emotional distress, intentional infliction of emotional distress, and *prima-facie* tort violations.
Results: Case settled for $7.75 million dollars.

» **People v. Jonai Washington, Indictment No.: 2510N/10(Nassau County), 2013 NY Slip Op 02600 Decided on April 17, 2013 Appellate Division, Second Department Leventhal, J., J., APL-2013-00174 NYS Court of Appeals**

Ms. Washington was arrested and charged with DWI and Manslaughter for hitting a man with her car in Uniondale, NY while on her way home from visiting a friend. At pre-trial hearings it was discovered that Ms. Washington had been denied access to her attorney who called to speak to her and that the police then ignored the attorneys instructions that she was not to be questioned or tested. She was actually feet away from the phone on which the call came to the officers. In the appeal against Jonai Washington, the Nassau County District Attorney's Office attempted to reverse the decision of Judge Peck of the Nassau County Supreme Court that was rendered in 2011, which suppressed the alcohol breath test results of Ms. Washington obtained after a motor vehicle accident. The appeal stems from an incident on August 30, 2010, when defendant Jonai Washington was arrested after being accused of driving drunk and killing a pedestrian. Ms. Washington consented to a chemical breath test to determine her blood alcohol content (BAC), but prior to administering the test, her attorney was in contact by telephone with the Nassau County Police and stated, "You have to stop all questioning and we're not consenting to any form of testing whatsoever." Despite the attorney's call, the police denied Ms. Washington access to her attorney, conducted the test anyway, and never informed her that her attorney called.

Results: Charges of Man-Slaughter and DWI dismissed. The People took an appeal. The Appellate Division, Second Department sustained the lower Court ruling and the New York State Court of Appeals affirmed the Appellate Division.

» **MHANY, et al. v. County of Nassau, et al.**,Case No. 05-CV-2301 (ADS)(ARL)(EDNY) ;843 F.Supp.2d 287 (2012); 985 F.Supp.2d 390 (2013); 4 F.Supp.3d 549 (2014);44 F.Supp.3d 283 (2014); 819 F.3d 581 (2016)

This historic decision, issued by the Honorable Arthur D. Spatt on December 6, 2013, ruled that the Village of Garden City violated the federal Fair Housing Act, the United States Constitution, and other civil rights statutes by enacting a discriminatory zoning ordinance in 2004 for the purpose of keeping minority households out of Garden City. The court found that the Village's action illegally discriminated on the basis of race and national origin against minorities in Nassau County and perpetuated deep-seated segregation, which has allowed Garden City to remain an overwhelmingly white enclave surrounded by predominantly minority neighboring towns.

Results: Trial Verdict for Plaintiffs and case was in post trial motions including application for attorneys' fees, which are now final. Case against Nassau County reinstated by the Second Circuit and currently in further discovery. Findings for Plaintiffs on discrimination claims and attorneys fees awarded.

» **Leo Smith, Jr., Benjamin C. Cannon, Jr. And John Christopher Smith v. Town of Hempstead, Department of Sanitation, Sanitary District No. 2, et al. Docket No.: CV 04-1589 (ADS) (ARL)(EDNY)**

On April 19, 2007, a hangman's noose was hung in a common area where the workers (sanitation workers) gather before going out into the field for work everyday. The noose was put up in an area were it was open for everyone to see and where all of the employees usually congregate during the workday, but in particular where the African-American workers often collected. Supervisor John Puglisi Sr. confirmed that Plaintiffs brought the noose to his attention early in the morning. According to Mr. Puglisi, Sr., Plaintiffs, as well as at least seven other African American employees, were "very insulted, upset, very taken aback, they felt, you know, that this was a racist act, you know, they were very offended by it."

Results: In the Civil Suit the case settled prior to trial

» **John Puglisi, Jr. v. Town of Hemp. Sanitary Dist. No. 2, et al., Docket No.: CV-11-445(JFB)(EDNY)**

Plaintiff, John Puglisi, Jr., a white male, is an employee of Sanitary District Number 2 in the Town of Hempstead, County of Nassau, State of New York. In 2007, a hangman's noose was discovered hanging in a place where the African-American and other employees gather in the morning before beginning their work. Upset and alarmed by the act of hate, employees alerted the District Supervisors regarding the noose and an investigation was initiated. Plaintiff's father, who also worked for the District as a supervisor, participated in the investigation and gave detailed information to the New York State Division of Human Rights and was chastised for doing so. Shortly thereafter, Plaintiff was subjected to retaliatory actions because his father participated and cooperated with the noose investigation. Plaintiff sued, claiming his relationship with his father was the reason for the harsh and wrongful treatment leveled against him.

Defendants moved for summary judgment, which was denied by then District Judge Bianco in January 2013.

Results: The matter settled to the mutual satisfaction of the parties before the scheduled trial before the Hon. Pamela K. Chen of the Eastern District Court of New York.

» **Osama Saleh v. Pretty Girl, Inc., et al., Docket No.: CV-09-1769 (RER)(EDNY)**

In 2007, Osama Saleh was employed by Pretty Girl, Inc. as a stock person. During his employment at the Knickerbocker store location of Pretty Girl, Mr. Saleh was repeatedly harassed and discriminated against by co-worker, James Robinson. Mr. Robinson consistently referred to Mr. Saleh as "Bin Laden" and regularly insulted Mr. Saleh based on his race and religion. On or about September 6, 2007, Mr. Robinson struck Mr. Saleh in the face, fracturing Mr. Saleh's zygomatic arch bone (cheekbone). Mr. Saleh required surgery and was hospitalized for approximately six days. Mr. Saleh suffered not only physical injuries, but was also emotionally distressed by the events that took place on September 6, 2007. The Pretty Girl store manager, defendant Albert Hamra, did not heed Mr. Saleh's complaints regarding Mr. Robinson, and took no action to protect Mr. Saleh from Mr. Robinson's continued harassment. Following the attack, Mr. Hamra failed to notify the police and it was Mr. Saleh's family members who contacted 911 to obtain emergency assistance for him after he was injured. Incredibly, Pretty Girl, Inc. even rehired Mr. Robinson at a different Pretty Girl location days after the attack.

Results: Following a four-day trial, a jury awarded Mr. Saleh $4.7 million in damages for discrimination, hostile work environment, assault and negligence claims against Pretty Girl, Inc., High Style, Inc., Albert Hamra, and James Robinson.

» **Ronald Lanier v. Village of Garden City, et. al. 2:17-CV-03287 (JMA) (EDNY)**

An African American retired Nassau County Corrections Officer filed a police misconduct case against the Village of Garden City after he was racially profiled by two white Village of Garden City police officers while shopping at the Western beef store in Mineola. These officers came up behind the retired corrections officer, ordered him to put his hands behind his back and threw him to the ground and proceeded to beat him on both sides of his ribs.

Results: Rule 68 Judgment accepted by Ronald Lanier for $150,000.00.

» **Nancy Genovese v. Town of Southampton, et. al. 10-CV-3470 (JFB) (AKT) (EDNY)**

Plaintiff was detained by a Town of Southampton police officer after he observed plaintiff taking photographs of a military base. After approaching the plaintiffs vehicle, the police officer discovered that plaintiff was carrying a rifle case and ammunition inside, which plaintiff was legally allowed to carry. Plaintiff was subsequently arrested for criminal trespass, and detained for four days and nights in the county jail and while in custody plaintiff endured extreme pain and injury due to being handcuffed and leg shackled. As a result, plaintiff experienced serious swelling and bruising, which were exacerbated because plaintiff suffers from rheumatoid arthritis. Plaintiff filed suit pursuant to § 1983 and state law claims against the law enforcement officials and government entities responsible for her detention and arrest.

Results: Jury awarded $1,112,000 in compensatory damages to plaintiff. Jury unable to reach a verdict on the issue of whether to award punitive damages as to one defendant. Court declared a mistrial as to that claim punitive damages and then the matter settled before the retrial.

» **Marc Jean v. Garden City Jeep Chrysler Dodge and Michael Volonakis, CV-17-4471 (DRH) (AKT) (EDNY)**

Discrimination suit brought by an African American Sales Associate at Garden City Jeep Chrysler Dodge against his employer after being threatened by a white General Sales Manager at gun point during an employee meeting. Subsequently, the General Manager was arrested and fired from the dealership.

Result: Case Settled to the satisfaction of both parties for an amount agreed to by the parties.

» **Jose Bautista, Maria Felix Bartolo and Mary Cruz Bautista v. The City of New York, et. al. *13-CV-08189*(AKH)(JCF) (SDNY)**

While incarcerated, plaintiff was repeatedly punched in the abdomen, head and body with extreme force. In addition, the plaintiff endured being kicked and assaulted with knees and elbows about the face, head, and body including the testicles. As a result, plaintiff suffered a life threatening injury requiring surgery to remove feet of his intestine. Plaintiff filed suit under 42 U.S.C. §1983 for excessive force, assault, battery, reckless and/or negligent infliction of both physical and emotional harm against the New York Department Correction.

Result: Settlement for $1,800,420.41.

» **John Cabreja II v. County of Nassau, et. al.   *CV-13-1019* (JMA)(AYS) (EDNY)**

A white Corrections Officer used vicious and outrageous conduct against a Hispanic inmate. Inmate suffered multiple jaw fractures, various facial contusions and hematomas. This encounter required plaintiff to have surgery to get his jaw wired on two different occasions. As a result, plaintiff filed suit against the Nassau County Correctional Facility for Discriminatory Harassment, Assault, Battery Intentional Infliction of Emotional Distress, Unnecessary Use of Force, Negligent Supervision, Failure to Properly Train and Negligence in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986.

Result: Case settlement for $387,500.00.

» **Johnathan Wharton v. County of Nassau *CV-10-00265 (JS)(AYS)* (EDNY)**

African American Correction Officer who was a Christian Chaplin and volunteered as such with the Fraternal Organization known as the N.C.S.D. Brothers of the Shield, Inc. was unreasonably issued a retaliatory Notice of Personnel Action and other administrative actions

for wearing his uniform while attending a religious service in the Chapel of the jail while off-duty. As a result, plaintiff files this religious discrimination and retaliation suit against the County of Nassau Sheriff's Department.

Result: Jury awarded the plaintiff $455,000.

» **Mark Robinson v. County of Nassau CV-12-4649 (JMA)(ARL) (EDNY)**

An African American man was physically abused by Nassau County police officers for trying to elicit help for his drunk white female friend whom he was trying to prevent from driving while intoxicated. As a result, the plaintiff filed a Civil Rights action pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, false arrest, abuse of process, excessive force, assault, battery, and false imprisonment.

Result: Settlement reached by the parties for $400,000.

» **Georgette Sorrell, Juana Rosario, Michel Williams and Donald Morency v.    County of Nassau, Village of Lynbrook Police,  et. al.  CV-10-0049 (DRH) (EDNY)**

An African American men and women were racially profiled and stopped by white Lynbrook Village police officers while Plaintiff were lawfully driving their vehicle through the Village. The white officers claimed that the car driven by plaintiffs matched the description of a vehicle involved in criminal activity that same evening. Plaintiffs were forced to stand in a straight line on the side of the road and subject to a suggestive show ups when a police cruiser carrying two individuals in the backseat slowly drove by. Subsequently, plaintiffs were arrested, wrongfully charged and maliciously prosecuted.  Gas station video revealed that the Plaintiffs could not have engaged in the alleged criminal activity as they were at another location (getting gas) at the time of the claimed crime.   As a result, plaintiffs filed an action against the Lynbrook Village Police and the County of Nassau Police Department pursuant to 42 U.S.C. §§ 1981 ,1983, and the First, Fifth and Fourteenth Amendments.

Result: Settlement reached by the parties in the total amount of  $595,000.

» **Darryl Coggins v. County of Nassau, et al., CV-07-3624, EDNY; 615 F.Supp.2d 11 (2009); 988 F.Supp.2d 231 (2013); 362 Fed. Appx. 224 (2d Cir. Jan. 28, 2010); 776 F.3d 108 (2d Cir. 2015); 254 F.Supp.3d 500 (2017)**

Plaintiff and two passengers were driving through Floral Park on their way to a diner when a Nassau County Police officer stopped the car he was driving and ordered him out of the car. The officer alleged that he believed Plaintiff had been drinking, which he had not, and conducted mock field sobriety tests but failed to record any results.  When Plaintiff expressed concern over how he was being treated, the officer placed his hand on his gun and threatened Plaintiff.  Plaintiff ran for his life and later returned to the police station only to learn he was being charged with weapons possession from a gun that was thrown down by the officers.

He was arrested and falsely charged. At the Grand Jury a Floral Park officer contradicted the contrived story of he Nassau Police officers and the charges were dismissed and one officer was charged with perjury and pleaded guilty. Mr. Coggins, commenced an action under 42 U.S.C §1983 for false arrest, malicious prosecution, abuse of process and other Federal and state law claims. As a result of the Investigation conducted by the Police Department, it was determined that Defendant BUONORA engaged in unlawful conduct in that on March 17, 2005, he appeared before the Nassau County Grand Jury in his capacity as a Police Officer and did give false testimony. On November 17, 2005, Police Officer BUONORA appeared before Judge Jeffrey Brown County Court Judge and pled guilty to a reduced charge of 210.05 of the NYS Penal Law, Perjury in the Third Degree, a Class A Misdemeanor. Suit was commenced against the officers and the County of Nassau.

Result: Settlement reached just prior to trial just short of one million dollars.

» **Greenaway, et.al. v. County of Nassau, et.al.,CV-11-2024 (LDH)(AKT)EDNY**

On April 25, 2010, Hempstead Police and Nassau County Police were involved with Plaintiff Shuay'b Greenaway. Shuay'b Greenaway, then 32, was painting his Hempstead residence's bathroom in 2010 when local officers came to his door following 911 calls from his family asking for help in convincing Mr. Greenaway to seek psychological help for his bipolar disorder. No violence or menacing behavior was alleged in the calls. After politely asking the officers to leave his home, a village officer ordered two others to tase him repeatedly. The rest of the officers subsequently pinned Besedin down, beating and dragging him away by his feet and legs.

Results: After a five day trial in Brooklyn, a jury of eight awarded Mr. Greenaway $8.32 million.

» **Flores et al. v. Town of Islip, et al., 18-CV-3549 (GRB) EDNY**

This case involved a challenge under the federal Voting Rights Act of 1965 to the "at-large" voting system which was then in effect in the Town of Islip, Long Island (the "Town" or "Islip"). That system had for many years systematically prevented members of the Town's minority Latino community from electing any candidates of their choice to the Islip Town Board, thus denying the members of that community their most basic rights. Lacking any representation on the Town Board, members of the Town's Latino community had been demoted to second-class citizens. Despite comprising almost a third of Islip's population, and despite voting cohesively in Town Board elections, Islip's Latino residents were not able to elect a candidate of their choice to the Town Board. No Latino residents, nor any other minority residents, had ever been elected to the Town Board in its history. The Class Action alleged that the political disenfranchisement of the Latino community was guaranteed by the Town's at-large voting system, which had allowed Islip's white majority, by voting as a bloc, to deprive the Town's Latino residents their right to elect their candidate of choice in every seat in every election for the Town Board.

Result: Case settled in th middle of the Cross examination of the Town Supervisor and at-large voting system was dismantled and replace with a councilmanic system which led to the election of he very first Latino person to the Town Board

» **Abreu v. Verizon New York, Inc., et.al**. **CV-15-58(SIL)(EDNY)**

In July of 2012 Mr. Abreu was moved from Fire Island for allegedly not wearing his VERIZON Company shirt. He brought a complaint to the New York State Division of Human Rights who found that their investigation revealed that the "dress code was not regularly enforced." As a result of his mistreatment, this 28 year veteran of VERIZON and former U.S. Marine ex-Marine lost overtime pay and was diagnosed with severe anxiety, depression and PTSD.

Results: After a two and a half week trial before the Honorable Steve Locke in the U.S. District Court for the Eastern District of New York, after years of litigation, this Federal Jury of four women and six men found that Mr. Abreu had been the victim of race, color and national origin discrimination and retaliation and awarded Mr. Abreu $2,655,000 for his damages, including lost overtime, severe emotional distress and punitive damages. Case subsequently settled for an undisclosed amount.

» **Kelly v. County of Suffolk, et al.**, **CV-21-6685 (BMC)(EDNY)**

Mr. Steven Kelly was a 37 year old resident of Suffolk County. He alleged that at or around 2:21am, on December 3, 2018 Mr. Kelly was wrongfully stopped while coming from a Seven-Eleven store and was subjected to excessive force, false arrest, fabrication of evidence, abuse of process and attempt to cover up an extreme constitutional violation to which he was subjected. Police Officer Muller of the Suffolk County Police Department who was driving his personal vehicle and failed to even provide proof of identification. Not only was Mr. Kelly charged with Obstructing Governmental Administration in the second degree, allegedly violating NY Penal Law §195.05 but he was shot by Officer Muller and as a result of Defendant Muller's heinous December 3, 2018 attack suffered serious and life lasting physical injuries. The damages in this matter were unquestionably weighty and will cause our client to suffer for the rest of his life. Not only is the removal of his spleen a life altering matter, but the absence of the spleen will subject our client to the exposure of bacterial infection that would otherwise be protected from. Mr. Kelly underwent numerous procedures to save his life including a laparatomy, splenectomy, having his fractured rib removed, and having a colostomy bag attached to his body which collected the fecal matter from his digestive tract.

Results: Settlement was reached prior to trial for a total of $1,700,000.00.

» **Gonzalez (Lazo), etc. v. County of Suffolk, et al.  09 CV 1023 (ST)(EDNY)**

Plaintiffs brought suit, pursuant to 42 U.S.C. § 1983, to redress the death of Mr. Kenny Lazo at the hands of the individual defendants, each of whom were and/or remain members of the Suffolk County Police Department.  Following nearly three weeks of jury selection, trial testimony and deliberations, the jury returned a resounding verdict in favor of Ms. Gonzalez. With limited exceptions regarding certain defendants, the jury found the defendants liable on every theory of liability presented to them, leaving no doubt that the defendants killed Mr. Lazo and did so with no meaningful oversight, investigation or discipline about the homicide.  Such claims included excessive force under the Fourth Amendment, denial of medical care under the Fourteenth Amendment, battery, wrongful death and negligence under state law.  They also included a claim of municipal liability under Section 1983, which the Jury determined that the evidence proved that the conduct of such Defendant(s) resulted from a custom, pattern, policy, or practice.

Results: All told, the jury awarded $14,303,500 in compensatory damages, and $21,500,000 in punitive damages (Total of $35,803,500.00).  Case settled for $20,000,000 before resolution of post-trial motions.

» **McCune v. County of Suffolk, et al.  2:14-CV-04431 (TS)**

Steven McCune was a heavy crane operator who sued Suffolk County and members of its police force alleging that at approximately 6:25 p.m. on April 3, 2012 he was beaten, taunted, stunned with a Taser in his groin and had his head grinded into the concrete by an officer's boot after he was on the ground and handcuffed. He was beaten into a state of what the medical records identify as "multiple trauma" which was "post assault" which was "questionably by 2 officers." That trauma included but was not limited to rhabdomyolysis; deep vein thrombosis; questionable nasal fracture; ecchymosis to left periorbital area; laceration to left supraorbital area; abrasions to the right forehead; bruising to anterior abdominal  wall; abrasions to left flank, back, knees, ankles and wrists; taser puncture wounds on back and left side of abdomen, acute myocardial infarction; right pneumothorax –traumatic (lung collapse); and three (3) stitches/staples. Mr. McCune filed suit and commenced his excessive force litigation to a jury trial.  After the first day of trial, the County offered a settlement that was agreed to by Plaintiff.

Result: Settlement after first day of trial on the amount of $500,000.00

» **Danzy v. Village of Hempstead et. al. 14-CV-07486 (JFB) (GRB) (EDNY)**

On September 25, 2013, at or about 9:00 - 9:30 p.m. in the Village of Hempstead Mr. Ronel Danzy had recently exited Hempstead Village Court wherein he was addressing tickets issued to him related to a motor vehicle. He was proceeding to the area of the Hempstead bus depot and/or train station to get a ride to travel home. Mr. Danzy was doing nothing unlawful and was not being disruptive to the public as alleged in the informations. Indeed, as per the

statements of witnesses who saw the incident, Mr. Danzy was quietly walking down the street when he was approached and stopped by Hempstead police officers. The Hempstead Police Officers asked Mr. Danzy for his identification and inquired as to whether he was familiar with someone named "Adrian." the next thing that Mr. Danzy recalls is waking up in the hospital with serious life threatening physical injuries including having had most of his teeth out, and caused him to lose so much blood that even the police officers claimed that they went to the hospital to safeguard themselves due to exposure to Mr. Danzy's blood. Indeed, Mr. Danzy's injuries (which were inflicted upon him by the Defendant police herein) here so severe that Mr. Danzy "coded," and/or had to be resuscitated twice - and brought back to life - while in the hospital as he was being treated for his injuries in I.C.U . He was falsely arrested and charged Mr. Danzy with Penal Law §§ 240.20 (disorderly conduct); 120.15 (Menacing in the third degree); and 205.30 (resisting arrest).  Two year later, on October 14, 2015, the Honorable Tricia Ferrell dismissed the charges against Mr. Danzy outright pursuant to motion by Mr. Danzy. Mr. Danzy filed suit and the matter went to mediation and the matter settled.

Result: Case settled during mediation in a considerable dollar amount which is subject to a confidentiality term as part of the settlement.

79.     This listing of cases is not exhaustive.  In fact, the Court recently presided over *Besedin v. County of Nassau, et al.*, CV 18-819 (NRM), in which the jury returned a verdict of $760,000 in compensatory damages, and $800,000 in punitive damages against two members of the Nassau County Police Department (for a total of $1,600,000).  Post-trial motions, including plaintiff's motion for his costs and reasonable attorneys' fees, led to a settlement before the Court.

80.     In addition, Judge Nina Morrison rendered a decision on Plaintiff's fee application in the matter of *Pfail v. County of Nassau, et al.*, which followed a jury verdict in Plaintiff's favor in the amount of $1,860,000 in compensatory damages and punitive damages of $293,580 each against Officers Panuthos, Massaro, and Iannucci, and $143,550 against Officer O'Brien. That case related to an incident on November 3, 2014 at the Fairway Supermarket in Westbury, New York, during which Plaintiff Brain Pfail ("Pfail" or " Plaintiff") was forcibly restrained by four officers from the Nassau County Police Department ("NCPD") and then placed under arrest. Plaintiff brought his action alleging, *inter alia*, that police officers Joseph Massaro ("Massaro"), Jonathan Panuthos

("Panuthos"), Karen O'Brien ("O'Brien"), Sergeant Thomas Iannucci ( "Iannucci"), and the NCPD (collectively, "Defendants") violated both federal and state law by engaging in excessive force, malicious prosecution, abuse of process, and battery against him.  On December 3, 2025, Judge Morrison, following the fully briefed fee application, awarded attorney's fees and discretionary costs in the total amount of $425,665.53 and adopted the hourly rates charged by Plaintiff's counsel, including an hourly rate of $600.00 for Mr. Brewington.

81.     Most recently, Mr. Brewington tried two cases before Courts in Eastern District that were victories for the firm's clients.

82.     One case is *Thomas Donohue v. Armor Correctional Health Services and Manetti*, ***CV-15-0636 (PK)***.  On September 18, 2014, Mr. Donohue entered the Nassau County Correctional Center. During processing, he underwent an evaluation performed by Dr. Vincent Manetti, employed by Armor Correctional Health Services, the private company contracted by Nassau County to provide healthcare services to individuals at the jail. For approximately twenty years before his incarceration, Mr. Donohue had been prescribed psychotropic medication to manage chronic depression, acute anxiety, post-traumatic stress disorder (PTSD), and panic attacks. His prescription was active and could have been readily verified through his pharmacy. Dr. Manetti conducted only a brief evaluation of Mr. Donohue, did not make an effort to verify the prescription at Mr. Donohue's pharmacy, and refused to give Mr. Donohue his medication. In fact, Dr. Manetti told Mr. Donohue that things are different now and we don't hand out pills anymore – deal with it. When Mr. Donohue filed grievances reporting the despicable care that he was being subjected to, Sheriff  Sposato did

nothing but support Dr. Manetti's inaction and referred Mr. Donohue's complaints right back to the offending party as Armor Correctional Health Services.

83.     The cruel decision to leave Mr. Donahue without the medication he relied upon for two decades caused him to endure severe depression, debilitating anxiety, recurring panic attacks, and emotional suffering for nine months while incarcerated, symptoms that were previously controlled through medication. Armor Correctional Health Services and Dr. Vincent Manetti left Mr. Donahue to suffer in a circumstance that can only be described as psychologically torturous.

84.     On June 26, 2026, a federal jury in the United States District Court for the Eastern District of New York awarded $3.25 million to Thomas Donohue after finding that Armor Correctional Health Services and one of its physicians, Dr. Vincent Manetti, violated Donohue's constitutional rights by denying him prescribed psychiatric medication while he was incarcerated at the Nassau County Correctional Center.  Following a multi-day trial before United States Magistrate Judge Peggy Kuo, the jury found that the Defendants acted with deliberate indifference to Mr. Donohue's serious mental health needs.

85.     An additional aspect of the lawsuit alleged that Mr. Donahue's experience was not an isolated incident, but that Armor Correctional Health Services maintained policies, customs, and practices that resulted in incarcerated individuals being denied access to critical medical care, including the denial of necessary medication. The jury ultimately concluded that Armor Correctional Health Services bore responsibility for violating Mr. Donohue's Constitutional rights and imposed $3,00,000 in punitive damages, $150,000 in compensatory damages against Armor Correctional Health Services and Dr. Manetti, and $100,000 in punitive damages against Dr. Manetti.

86.     In the matter of *Fee v. Town of Hempstead, et al.* 17-CV-5410 (AYS)(EDNY) a federal jury in the United States District Court for the Eastern District of New York has awarded $5.2 million to former Town of Hempstead Highway Department employee, Debra Fee. Following a multi-day trial before United States Judge Anne Shields, the jury returned its verdict on July 16, 2026, and concluded that the Town unlawfully retaliated against Ms. Fee for asserting her rights after she complained about being denied advancement opportunities.

87.     Ms. Fee began working for the Town of Hempstead Highway Department as a seasonal employee in 2006 before becoming a full-time Laborer I in 2011. This position required Fee to manage the Department's stockroom, maintain inventory, order vehicle parts, and coordinate with mechanics. Despite consistently taking on responsibilities beyond her job title, she was repeatedly passed over for advancement while male colleagues with less experience and time on the job were promoted.

88.     After not being promoted and only seeing men advance over her, in 2016, Ms. Fee requested a Civil Service Desk Audit to determine whether the duties she was taking on warranted a higher classification. After she requested the audit, Defendant Thomas Toscano, the Highway Department Commissioner, told her that if she did not withdraw her application for a title change, he would remove her from her position. This threat was supported by Defendant Antonio Fanizzi, another Supervisor in the Highway Department. In response to her application, Ms. Fee was removed from the stockroom and reassigned to physically demanding manual labor on a highway maintenance truck, which included filling potholes, moving barricades, cleaning storm drains, raking leaves, removing dead animals from the road, and performing other strenuous outdoor work. This retaliatory

move for asserting her rights caused Ms. Fee to experience a significant amount of physical pain and immense emotional distress.

89.    The jury found that the Town unlawfully retaliated against Ms. Fee after she engaged in protected activity and awarded $1,150,000 in past pain and suffering and $3,180,000 for future pain and suffering. Co-Defendants Toscano and Fanizzi were found liable for $330,000 and $200,000 in punitive damages, respectively.

90.    In addition to my work in litigating cases, I have been and remain actively involved in lecturing and instructing other lawyers in trial techniques and legal issues of varied subjects.  I am an adjunct professor teaching pre-trial litigation and trial practice techniques at Touro Law Center. I have participated on separate lecturing faculty panels in the area of 42 U.S.C. § 1983 litigation in this region and around the country, including at the Touro Law Center, National Convention of the American Bar Association, National Bar Association, American Trial Lawyers of America, New York State Bar Association, Long Island Housing Services, National Police Accountability Project and the Practicing Law Institute (PLI) to name just a few.  I have lectured as a speaker and panelist for numerous legal organizations and educational institutions including, among others, N.A.A.C.P., the National Employment Lawyers' Association, CUNY Law School, Southern University Law Center, Hofstra University, Adelphi University, Old Westbury College, Northeastern University School of Law, Macon B. Allen Bar Association, Amistad Black Bar Association of Long Island, Suffolk County Criminal Bar Association, Nassau County Criminal Bar Association, New York City Bar Association, Suffolk County Bar Association and the Nassau County Bar Association.

91. I have practiced in the areas of housing, education, police misconduct, labor and employment law since 1986. My first employment out of law school was in the area of community development and housing development in the South Bronx and Brooklyn. I have handled many civil rights cases brought pursuant to the First, Fourth, Fifth, Sixth, Thirteenth, Fourteenth Amendments to the United States Constitution, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 2000(e), 2000(d), ADA, FHA, ADEA, FMLA, Voting Rights of 1965, New York State John R. Lewis Voting Rights Act, the New York State Executive Law, Human Rights Law, Section 290, et seq., NYC Human Rights Law, New York State Civil Rights Law, as well as other statutory and Constitutional matters.

92. In addition to serving as an Adjunct Law School Professor and instructor for attorneys, I continue to maintain community ties by serving on a number of Boards of Directors, including ERASE Racism, S.T.R.O.N.G. Youth, Inc.; National Police Accountability Project (NPAP) Board President Elect; Trustee New York Annual Conference of the United Methodist Church, General Board of Church and Society of the United Methodist Church, Co-Convener of The Corridor Counts, Inc. (TCC), Long Island Advocates For Police Accountability, Inc. (LIAFPA), Far Rockaway Mission, UMC; Hofstra Law School Monroe H. Freedman Institute for the Study of Legal Ethics. I continue serving as a volunteer high school varsity football coach (over 44 years) and other teaching and lecturing services. I am a Certified Lay Servant in the United Methodist Church and teach preaching and Lay Servanthood for the Long Island East District of the United Methodist Church. I have been selected to receive a number of awards, including Hempstead Village Hall of Fame, Kairos Award from the Long Island Alliance for Peaceful Alternatives, Bench and Bar Award from the Fraternal Order of Court Officers, Distinguished Speaker Award from the Nassau County

Guardians Association, Inc., and the International Gandhi-King-Ikeda Award from Morehouse College, to name just a few.

93.     In June 2017, I was humbled to be named the top Civil Rights Lawyer in New York State by the New York State Bar Association.  I received the Haywood Burns Award, which honors an individual, not necessarily a lawyer, who has contributed to New York State in a manner that reflects Dean Burns' commitment to the struggle for justice and the qualities that made him an outstanding advocate for civil rights and the empowerment of the powerless. The 72,000-member New York State Bar Association is the largest voluntary state bar association in the nation.

94.     My activities, speaking engagements and other aspects of my professional career are set out in more detail in the attached *Abbreviated Curriculum Vitae*. (Exhibit 2)

95.     My requested hourly rate of $650  is the rate I regularly charge my clients.  This is a fair current rate given the level of specialized civil rights work, trial experience and the responsibility associated with representing clients in this focused practice for more than thirty-eight (38) years.

96.     The number of hours for which my staff and I bill currently stands at 449.70 hours as of July 31, 2026. Based upon the calculation of my time only, I have incurred on the Plaintiffs' behalf reasonable attorneys' fees in the amount of $204,425.00, which represents 314.50 hours at the hourly rate of $650, for the work I performed through the date of this fee application.

97.     In requesting an hourly rate of $650, I note that judges in this district have repeatedly noted that I am one of the foremost civil rights attorneys.  Most recently, in *Taylor v. Cooper Power*

*Lighting, et al.*, 22-CV-2236 (HG)(SIL), Magistrate Judge Locke recommended that plaintiff be awarded fees for the work I performed at an hourly rate of $600. The R&R was entered on July 14, 2025. To date, the matter was on appeal after the Defendant's objections were denied to the R&R were denied and was recently sent to the District Court with a denial of the appeal.

98.     Magistrate Judge Locke's recommendation to award me fees at the highest hourly rate is consistent with the judges in this district's recognition of my talents. For example, I successfully tried *Werring v. SUNY Farmingdale, et.al.* 98-CV-5248, before Magistrate Judge Boyle. Twenty-four years ago, on October 4, 2000, following Mr. Werring's application for attorney's fees, Magistrate Judge Boyle noted the following:

> Mr. Brewington is a skillful and seasoned civil rights litigator who actively practices in the United States District Court[s] in the Eastern and Southern Districts of New York. Judge Boyle went on to issue an order that "Mr. Brewington is entitled to the requested $300 per hour for his efforts in support of Plaintiff's action."

99.     From November 16, 2000 until January 5, 2001, I engaged in a hard fought trial before Judge Seybert in *Duke v. County of Nassau*, 97-CV-1495, 2003 U.S. Dist. LEXIS 26536 (E.D.N.Y. Apr. 14, 2003). I worked on that matter from the date of the decedent's death for the next seven (7) years, including appeal. In *Duke*, the jury awarded Plaintiff more than $2,000,000 in damages. In her fee award, Judge Seybert stated:

> This Court believes that $300 per hour is a reasonable rate for the work of an attorney with Brewington's skill, experience and expertise, particularly in light of the success achieved in the instant case. Duke, 2003 U.S. Dist. LEXIS 26536, *6.

100.     Twenty-four years ago, on March 20, 2002, I appeared before Judge Block in *Jackson v. Town Hempstead*, 98-CV-5635, to discuss Plaintiff's fee application with the Court and opposing counsel. During the conference Judge Block stated the following:

I am inclined, although I haven't come to a final determination, to accept Mr. Brewington's $300 as the hourly rate for his service.

Judge Block stated further that he viewed me:

> as being that special type of attorney who is particularly skilled in these type of cases and I think you view him that way, also, Mr. Ryan, and I've also had the opportunity to observe his performance and I recall how helpful he was to the Court in pointing out the law in respect to potential liability of an individual official of the town under 1981, if I recall correctly.

101. In *Luca v. County of Nassau*, 04-CV-4898 (FB), Judge Block presided over a trial between October 9, 2007 and October 17, 2007. On October 17, 2007, the jury returned a verdict of liability. During trial, the jury found that the County retaliated against Ms. Luca when it failed to hire her for a position with the Nassau County Police Department and awarded damages for pain and suffering in the amount of $150,000.00. Following hearings before the Court to determine what, if any, front pay would be awarded, the Court directed judgment be entered in favor of Ms. Luca in the total amount of $949,973.86.

102. After appeal, in the decision awarding attorneys' fees, Judge Block in part quoted an earlier ruling of his and also wrote:

> The Court adheres to its findings of fact with respect to Brewington's experience and the quality of the services he provided in this case:
>
> Brewington has over 25 years' experience as a lawyer. In 1987, he started his own firm, specializing in plaintiffs-side civil rights cases; according to docket searches, he has handled roughly 180 such cases in the Eastern District of New York and another 20 in the Southern District. His peers recognize him as an authority in his specialty, as evidenced by his numerous teaching and speaking engagements.
>
> * * *

The caliber of Brewington's performance against a tenacious adversary was outstanding and resulted in an extremely favorable result for his client. *Luca* Dist. Ct. Op. at *9-* 10. Brewington's proposed rate of $400 per hour exceeds the fee awards he has received in prior Eastern District litigations. See *Cruz v. Henry Model & Co.*, No. 05-CV-1450, 2008 WL 905351 (Tomlinson, M.J.) (E.D.N.Y. Mar. 31, 2008) (awarding Brewington $325 per hour); *Duke v. County of Nassau*, No. 97-CV-1495, 2003 WL 23315463 (Seybert, J.) (E.D.N.Y. Apr. 14, 2003) ($300 per hour); *Werring v. SUNY Farmingdale*, No. 98-CV-5248, Docket Entry No. 43 (Boyle, M.J.) (E.D.N.Y. Oct. 4, 2000) ($300 per hour). Nonetheless, numerous recent cases in the Eastern District convince the Court that a reasonable paying client would gladly pay $400 per hour for an attorney of Brewington' s caliber. See *Gutman*, 2009 WL 3296072, at *2 (hourly rates of between $300 and $400 for partners found to be "within the Eastern District range")*; Rodriguez v. Pressler & Pressler, LLP*, No. 06-CV-5103, 2009 WL 689056 (Cogan, J.) (E.D.N.Y. Mar. 16, 2009) (awarding $450 per hour to civil rights attorney with 17 years of experience in FDCPA case); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d157, 208 (E.D.N.Y. 2006) (James Orenstein, M.J.) (awarding $350 per hour to partners in ADA employment discrimination case), aff'd , 531 F.3d 127 (2d Cir. 2008); see also *Morgenstern v. County of Nassau*, No. 04-CV-58, 2009 WL 5103158, at *16-18 (Lindsay, M.J.) (E.D.N.Y. Dec. 15, 2009) (awarding $400 per hour in a § 1983 case, relying on Judge Cogan's analysis in *Gutman*). The $400 which Brewington seeks is compatible with these awards. (*Luca v. County of Nassau*, 698 F.Supp.2d 296, 301-02 (E.D.N.Y., 1/25/2010)).

103. Just a few months ago, in awarding Mr. Korenbaum an hourly rate of $500, Judge Brown stated the following about me: "Mr. Korenbaum's application is a veritable model of professionalism. His hourly rate of $500 per hour is supported not only by the results of the case, but specifically by a sworn declaration of Fred Brewington, Esq. - a lawyer well known to, and respected by, this Court." *McDevitt v. Suffolk Cnty.*, CV 16-4164, 2025 U.S. Dist. LEXIS 89130, *7 (E.D.N.Y. May 9, 2025).

104. While my hourly rate charged in 2010 was $450.00, Judge Block awarded me an hourly rate of $400.00 in *Luca*. My hourly rate increased to $500.00 in 2012; in early 2018 it increased to $600.00, and in December of 2025, my hourly rate increased to $650.00 per hour which is my current rate that I charge for all of my cases. My office currently bills senior associates starting at the rate of $350 and above, $300 for mid-level associates and $250 or less for junior associates

based on the level of their expertise and years of practice. We bill our para-professionals at the rate of $100 per hour and $150.00 per hour for law graduates who are not barred.

105. In *Anderson v. County of Suffolk, et al.* CV-09-1913 (GRB), a case first tried before Judge Seybert, the jury reached a verdict in Plaintiff's favor. The court ordered a retrial, which occurred before then Magistrate Judge Brown. The second jury awarded Mr. Anderson $95,000 in damages for civil rights violations after suffering mental and physical abuse at the hands of two Suffolk County deputies. Post-trial motions for a new trial and to overturn the verdict were denied. On April 11, 2016, following Plaintiff's application for attorneys' fees as the prevailing party, then Magistrate Judge Brown granted Plaintiff's application and stated the following:

> Here, Brewington, an experienced civil rights attorney who has been practicing law since 1986, requests a rate of $500.00 per hour. Pl.'s Br. 9; Brewington Decl. 22. "The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields." *Medina v. Donaldson*, No. 10 CIV. 5922 VMS, 2015 WL 77430, at *6 (E.D.N.Y. Jan. 6, 2015). Brewington unquestionably falls within this category. *Luca*, 698 F. Supp. 2d at 301-02..... In 2010, a district court awarded Brewington $400.00 an hour. *See Luca v. Cnty. of Nassau*, 698 F. Supp. 2d 296, 302 (E.D.N.Y. 2010). Thus, based on the foregoing, along with my personal experience with counsel, the Court awards Brewington the reasonable hourly rate of $450.00 per hour.

*Anderson*, CV 09-1913, 2016 U.S. Dist. LEXIS 48891, at *10-11 (E.D.N.Y. Apr. 11, 2016).

106. Against this back drop, I know that the work done for Plaintiffs would have been done at the same level no matter where I maintained my office. I have conferred with colleagues who maintain their offices in Manhattan and the Bronx, and in doing so have learned that for work on cases such as this, they have been awarded $650.00 an hour or greater for their services. In some cases attorneys with fewer years of practice and experience have been provided fee awards with much higher rates that dwarf that being sought here.

107.     In an Eastern District case, *U.S.A. and Vulcan Society v. City of N.Y.*, 2013 WL 5542459, at *8 (awarding rates of $550 to partner-level attorneys and rates as high as $450 to an associate-level attorney) In that case, Judge Garaufis took into consideration the individual experience and qualifications of each attorney and found that every trial attorney with over thirty (30) years of trial experience, like myself, was awarded the hourly rate of $550.00 and attorneys with much fewer years were awarded $450.00. Likewise, an attorney with less than half the years as I have now (Darius Charney) was awarded the hourly rate of $450.00. The chart below samples those fees awarded more than thirteen (13) years ago in 2013.

| Attorney | Law School Graduation | Years in Practice | Requested Rate (Per Hour) | Awarded Rate (Per Hour) |
| --- | --- | --- | --- | --- |
| Richard A. Levy | 1968 | 45 | $650 | $550 |
| Robert H. Stroupb | 1974 | 39 | 650 | 550 |
| Richard Dorn | 1960 | 53 | 575 | 550 |
| Darius Charney | 2001 | 12 | 525 | 450 |
| Judy Scolnick | 1976 | 37 | 770 | 550 |
| Beth Kaswan | 1976 | 37 | 775 | 550 |

108.     In addition to the discussion of the appropriate rate for me, we ask the Court to consider the several Declarations submitted in support of my hourly rate provided the Court in *Greenaway, et al. v. Nassau County, et al.*, 11 Civ. 2024 (LDH), from Harry Ballan, Patricia Salkin and Howard Glickstein, all former Deans from the Touro Law School. Each of these learned

colleagues supply the Court with a prospective that supports the rates requested. (See Exhibit 3, 4, and 5 respectively)

109.	In addition, the declarations of two well respected practitioners and scholars, Randolph McLaughlin and Rick Ostrove, provided the Court in *Greenaway v. Nassau County* with relevant and helpful information that supports the hourly rate which is sought herein in this application (See Exhibits 6 and 7).  I note that the parties in *Greenaway* settled the fee application before the Court had the opportunity to issue an Order relating to it.

110.	The declaration of Jonathan Moore provides the Court with further support for my requested hourly rate from a seasoned and well-known attorney.  (Exhibit 8).

### WORK PERFORMED BY OTHER OFFICE ASSOCIATES AND LEGAL STAFF

111.	In addition to my efforts, six other Attorneys and five other para-professionals[1] from the Law Offices were involved in providing services and representing the Plaintiff in this case. Those individuals include Albert D. Manuel, Esq., Gregory Calliste, Cathryn Harris-Marchesi, Esq., Cobia M. Powell, Esq., Dennis Swanson, Esq., Lorraine R. Bishop, Esq.,  Precilla Lockett, J.D., Danielle Speziale, J.D.,  Lavern Van Ommerran, Christina Portee, Essence Hightower.  Each of these associates and legal assistants contributed to the legal work in this case and we have exercised billing judgment and decided to exclude them from this fee application.

112.	A chart of each person from our office for whom we claim fees, along with their rates requested and number of hours expended is provided below at Paragraph 149.

---

[1]  This listing of persons does not include the support and administrative staff members for whom no hours are submitted.

113. The rate I seek and the rates sought by the other members of the office are compatible with the nature and complexity of the proceedings herein, the experience and qualifications of the attorneys providing services, and the rates prevailing in the legal community for work of comparable complexity performed by attorneys of comparable experience and qualifications.

## ALBERT D. MANUEL

114. Albert D. Manuel graduated from the Touro College Jacob D. Fuchsberg Law Center in 2017. He was first employed by my office on January 6, 2020. In addition to his skill as a civil rights trial lawyer, Mr. Manuel has gained considerable experience and knowledge in government, appeals and personal injury litigation. He has served as an Associate in three firms doing general practice and litigation before joining our office. Mr. Manuel has briefed cases at all state levels as well extensively in the Eastern District on motions to dismiss and summary judgment motions, where he has appeared and argued before judges in the State and Federal Courts. During most of the pendency of this case he was the most senior associate in the Law Offices. Mr. Manuel has prepared the clients for, and defended their depositions, taken numerous depositions, interfaced with defense counsel, second seated me during Federal trials, drafted complaints, prepared and filed motions, appeared at court conferences, helped draft the Joint Pretrial Order, interacted with the clients, and reviewed and prepared documents relative to the papers filed with the Court.

115. Mr. Manuel has distinguished himself as a dedicated and skilled attorney. He is well ahead of most of his peers in that his level of experience and knowledge of the practice of law demonstrated that his seven years of practice has allowed him to mature as an attorney and an advocate. Not only has he taken numerous depositions, conducted and second-seated trials and has addressed difficult and complex legal issues in writing and orally with the skill of a lawyer having

-58-

twice his years of experience, but his input in legal strategy is key to the office. He is admitted to the bar of New York and is admitted to the Eastern and Southern Districts of New York. He is also a member of the bar of the Second Circuit Court of Appeals. While Mr. Manuel did not bill a significant number of hours in this case, his hours were significant to the success of this case.

116. Mr. Manuel respectfully claims an hourly rate of $300.00. In *Taylor*, *supra*, Magistrate Judge Locke approved of this hourly rate for the work performed by Mr. Manuel.

### COBIA M. POWELL

117. Cobia M. Powell is an Associate in the Law Offices. He graduated with a Doctor of Jurisprudence Degree from the City University of New York in 2021. He was admitted to the Bar of New York in 2022, and is also admitted to the U.S. District Court for the Southern and Eastern Districts of New York. Mr. Powell received a Bachelor of Arts Degree from Syracuse University in 2018. As a student and prior to coming to the Law Offices, Mr. Powell worked at Bank of New York Mellon, New York City Legal Aid, and interned in our offices. From his high school years onward, Mr. Powell has geared his education, training and desire to practice law and specifically devoting himself to civil rights litigation.

118. Since joining the Law Offices, Mr. Powell has fully embraced the Civil Rights practice with a level of commitment that sets him apart from any other lawyers at his level. He has volunteered and lectured in high schools and at CUNY and continues to encourage and mentor other young attorneys to engage in Civil Rights work.

119. Mr. Powell's work with the firm centers largely around Plaintiff side 1983 civil rights cases, police and/or government misconduct, employment discrimination, sexual harassment, and

municipal liability in Federal Courts, New York State Courts as well as agencies such as the Equal Employment Opportunity Commission and the New York State Division of Human Rights.

120.     Mr. Powell, alongside me, has second seated a total of five Federal trials so far. Those include: *Besedin v. County of Nassau et al.* CV-18-819, before the Honorable Judge Morrison; *Russo v. Tuttnauer USA Company Limited et al.*, CV-21-1720, before the Honorable Judge Azrack; *Pfail v. County of Nassau et al.*, CV-16-518, before Judge Morrison; *Fasolakis v. County of Nassau et al.*, CV-22-7954, before the Honorable Judge Choudhury; and *Donohue v. Manetti et al.*, CV-15-636, before the Honorable Judge Kuo.

121.     Four of the trials ended with positive verdicts for our office. And although Fasolakis did not end in our office's favor, Mr. Powell was extremely helpful in the presentation of the case. Mr. Powell's involvement, as a second seat in the five matters, was not identical, however, he played an integral part in different ways.

122.     In the *Besedin* matter, he was able to organize the causes of action chart which indicated the legal claims we needed to prove; supervise the binders being created and make sure everything was done in accordance with Judge Morrison's rules; and help with legal strategy as well as creating examination questions for Lloyd Nadel, Esq. In *Russo*, he wrote questions for several witness which included Richard Kelstein, John Carter, Mark Brown, and Richard Russo; constantly being involved in legal strategy, which included but is not limited to making and responding to motions *in limine*; and conducting the direct and cross examination of Plaintiff's son at the trial. In the Pfail matter, he was involved in ever-changing legal strategy, communicating information to the client regarding testimony, strategy, and keeping him calm pre-, post- and during the trial day. Also, Mr. Powell helped in presenting and displaying evidence to the jury through the Elmo and from his

computer, speaking on the record, as to potential limiting instructions and other trial issues, and conducting the cross examination of his first adverse trial witness, Defendant Officer Karen O'Brien, which included but was not limited to objecting and making motions to strike portions of her testimony. In the *Fasolakis* matter, he performed his necessary tasks as a second seat in trial preparation, he prepared and facilitated communication with all of Plaintiff's witnesses; he prepared to take the cross examinations of Defendants' witnesses Mr. Calderon and Mr. Rhadigan and cross examined Mr. Rhadigan. In the Donohue matter, which was his fifth time second seating alongside me in twenty (20) months, prior to the trial commencing, Mr. Powell argued at the initial pre-trial conference hearing; assisted in preparing the trial exhibits; finalized motions *in limine*; verified the trial technological equipment, facilitated communication, strategy, and preparation of both expert witnesses (Dr. Mendelsohn and Dr. Herrington); kept track of exhibits admitted into evidence; and helped present and publish evidence to the jury during closing.

123.    In addition to Mr. Powell's contributions at the Federal Trials, he has completed multiple conferences, in-person, over zoom, and telephonic, in our Southern and Eastern District cases. Mr. Powell has argued and/or first seated several motion, and summary judgment/settlement conferences in several cases.

124.    Mr. Powell, while still early on in his legal career, has already completed an assortment of tasks which include: trial preparation, conducting and defending depositions, working with our legal team, especially paralegals, to stay on track with pre-trial, motion, discovery, and complaint deadlines; filing Federal and New York State Division of Human Rights Complaints; reviewing several videos, audio files, and thousands of pages of discovery; contacting prospective experts to be retained; fortified his communication skills with adversaries in discussing cases; and

gathering facts and discoverable information from doctors, medical providers, experts, the Division of Human Rights, clients, and opposing counsel(s).

125.    Mr. Powell was involved in all aspects of this matter.

126.    Further, Mr. Powell's engagement with and care for the clients during challenging times in and out of the Courtroom assisted in making sure the presentation of Plaintiffs' testimonies went smoothly.

127.    Mr. Powell has already amassed a great deal of litigation experience. His work in the civil rights arena allowed him to use his sense of justice and background and to become an excellent advocate for persons such as Plaintiffs.  He respectfully claims an hourly rate of $250.00.  In *Taylor*, *supra*, Magistrate Judge Locke approved of this hourly rate for the work performed by Mr. Powell.

### PRECILLA LOCKETT

128.    Precilla Lockett was awarded a Bachelor of Science Degree from the St. John's University. Ms. Lockett is a 1999 Graduate of the Touro College Jacob D. Fuchsberg Law Center. She is a law graduate, but is not barred.  While at Touro, Mr. Lockett served as President of the Black Law Students Association and was active in the Suffolk Law Journal and the student division of the National Bar Association. Ms. Lockett was of major assistance in the preparation and research of issues which were raised during this matter at all levels.  The hours she spent working on this matter were necessary and part of the total team effort which led to the favorable determination in this case.

129.    As part of her duties, it was necessary to spend a great deal of time organizing exhibits to be provided to the Court, coordinating the work being done by other legal staff,  and orchestrating duties of office staff members.  A dedicated advocate and humanitarian, Ms. Lockett

helps to foster the unique personal relationship that exists between the Law Offices and the many clients it serves. Using her law degree, Ms. Lockett has successfully combined her keen administrative skills and her passion for the law to earn the position of Legal Office Administrator. Her ability to manage the ongoing client contacts and daily law office management issues has helped to make the Law Offices an efficient and caring place for its clients.

130.    Ms. Lockett respectfully claims an hourly rate of $150.00.  See Exhibit 1.  In *Taylor*, *supra*, Magistrate Judge Locke approved of this hourly rate for the work performed by Ms. Lockett.

## **CATHRYN HARRIS-MARCHESI**

131.    Cathryn Harris-Marchesi was a senior associate at the Law Offices.  She brought a wealth of knowledge and has developed an expertise in civil rights work.  She has handled matters involving federal and constitutional law, products liability, wrongful death, public and private employment, employment discrimination, fair housing, education law and excessive force.  She obtained her law degree from Northeastern University School of Law.  She has been a member of the New York Bar since 2006.  Ms. Harris-Marchesi is admitted and has argued before the Second Circuit Court of Appeals, U.S. District and State Supreme Courts.

132.     While attending Northeastern University School of Law, Ms. Harris-Marchesi was a Judicial Extern for the Honorable Kim McLane Wardlaw of the United States Court of Appeals for the Ninth Circuit; a Teaching Facilitator selected to teach the "Law, Culture and Difference" course; a Research Assistant to Professor Deborah Ramirez where she managed a team of research assistants; a Teaching Assistant who conducted lectures on hate crimes to law students; Student Project Manager for the University's Justice Institute; and she was recognized on several of Professor Ramirez's law journal articles on racial profiling and racial equity as a contributor. After

obtaining her juris doctorate, Ms. Harris-Marchesi was selected as a Litigation Fellow at Wiggins, Childs, Quinn and Pantaniz, LLC in Washington, D.C., where she worked on all aspects of litigation, mediation and negotiation involving mostly Title VII class action lawsuits. She then moved to Long Island to become the Housing Project manager at ERASE Racism. Ms. Harris-Marchesi's achievements in this position included conducting fair housing legal analysis and drafting reports that were published in 2005 and 2009. She worked with a small team and drafted new fair housing laws with enforcement systems that were enacted in Nassau and Suffolk Counties in January 2007, and conducted legal analysis of proposed community development plans and zoning ordinances.

133.    From 2009-2015, Ms. Harris-Marchesi was the Hearing Officer for the Nassau County Department of Housing and Community Development where she conducted hearings regarding individuals who had their Section 8 benefits terminated. In 2005, she was appointed by then-New York State Governor George Pataki as a board member on the Nassau County Rent Guidelines Board, and became a board member for Long Island Housing Services in 2011. She continues to serve on both boards. Ms. Harris-Marchesi has been a guest lecturer on several occasions at CLE Programs hosted by the Nassau County Bar Association and the New York City Lawyers Association regarding Fair Housing and Civil Rights issues, as well as a guest lecturer at Stony Brook University and Touro Law School.

134.    Ms. Harris-Marchesi was involved in the early stages of discovery and worked closely with Plaintiffs. She provided in depth research and writing to work through legal issues dealing with the claims for relief, attending court conferences, as well as reporting to the Court on status during the pendency of the underlying criminal case,  As reflected by her time sheets, Plaintiffs seek compensation for the XXX hours she committed to this case.

135.    Ms. Harris-Marchesi's time spent on this case was limited, but her multipurpose hand and input was nonetheless helpful in our representation of Plaintiffs.  In this case, and in others, her zeal and dedication was consistent with the many accomplishments throughout her legal career.  Ms. Harris-Marchesi respectfully claims an hourly rate of $350.00, which is fair and reasonable for an attorney of her skill, qualifications and experience - Ms. Harris-Marchesi was not involved in *Taylor*.

### GREGORY CALLISTE, JR.

136.    Attorney Gregory Calliste, Jr. was first employed by my office on January 20, 2004. In addition to his skill as a civil rights trial lawyer, Mr Calliste has gained considerable experience and knowledge in government, criminal and personal injury litigation. He served as a Law Student Associate in the New York City firm of Queller, Fisher, Dienst, Serrins, Washor, Kool, LLP and was graduated from the New York Law School in May 2003. Mr. Calliste has briefed cases at all State levels and briefed cases extensively in the Eastern District Court, Southern District Court where he has appeared and argued before most of the Judges and Magistrate Judges. In this case, Mr. Calliste provided support and direct contact with the clients, wrote important documents in the early stages of this matter.  In addition, he was responsible for the reviewing and preparing documents relative to discovery.

137.    At the time of his involvement in this case, Attorney Calliste while only having graduated law school in 2003 has distinguished himself as a dedicated and skilled attorney. Now more than twenty -three years out of law school he was and is well ahead of most of his peers . He has taken numerous depositions, conducted and second seated on many trials and has addressed difficult and complex legal issues in writing and orally with the skill of a lawyer having twice his years of experience. He is admitted in both New York State and New Jersey and is admitted in the

Eastern Southern, and New Jersey Federal District Court. He is also admitted in the Second Circuit Court of Appeals, were he as appeared on brief with me.

138. Mr. Calliste respectfully claims an hourly rate of $350.00, which, I believe to be fair and reasonable for an attorney of his skill, qualifications and experience.

### DENNIS SWANSON

139. Mr. Swanson graduated from Hofstra Law School in 2021. He was hired directly following his graduation and worked in our offices for approximately seven months.

140. His work on this case, while limited, provide helpful and important support for myself and the client. Mr. Swanson claims the hourly rate of $200.00. In *Taylor*, *supra*, Magistrate Judge Locke approved of this hourly rate for the work performed by Mr. Swanson.

### DANIELLE SPEZIALE

141. Danielle Speziale, JD. is a recent law school graduate and serves as the firm's Law Clerk. Speziale is passionate about civil rights, constitutional protections, and criminal legal reform, and is dedicated to advocating for individuals and communities that have been historically marginalized by legal, political, and social institutions.

142. Speziale earned their Bachelor of Arts in Political Science and English, with a concentration in Multicultural Literature from the State University of New York (SUNY) Old Westbury. Following graduation, they attended the City University of New York (CUNY) Law School, where they earned their Juris Doctor on the accelerated track in just two and a half years. Throughout law school, Speziale distinguished themselves as both a scholar and a leader committed to creating more equitable pathways within the legal profession. They served as the Vice President of the Formerly Incarcerated Law Student Association, where they advocated for the inclusion and

support of students directly impacted by the criminal legal system. They also held leadership positions as Secretary and later, Vice President of the Mock Trial Program, where they developed courtroom advocacy skills, mentored fellow students, and competed as First Chair for the Criminal Defense team in the Queens District Attorney Mock Trial Competition. Speziale has completed two Trial Advocacy courses, earning "A" grades in both. Their academic work focused heavily on constitutional rights, state accountability, and human rights. Their legal research explored Section 1983 litigation, police use of force, municipal liability, procedural due process under the Fourteenth Amendment, First Amendment protections for protest and political expression, women's rights in Afghanistan, and the authority of the International Criminal Court.

143. Mentorship is a central part of Speziale's professional identity. Through the Black Law Students Association (BLSA), she served as a mentor to law students navigating the challenges of legal education and assisted in fostering support and belonging for historically marginalized students. In addition, she has served as a Teaching Assistant (TA) for Contracts, a mandatory course taken by first-year law students, where she had the opportunity to work closely with students to strengthen their legal reasoning and analytical skills.

144. Before entering law school, Speziale spent three years working as a Criminal Defense Paralegal, where they assisted attorneys representing clients accused of crimes and gained firsthand experience into the realities of the criminal legal system. Prior to that, they worked as a legal secretary in real estate, estate planning, and tax law. As they prepare to take the July 2026 bar exam and become a licensed attorney, Speziale hopes to dedicate their career to civil rights litigation and criminal defense, with particular focus on Section 1983 municipal liability claims, police accountability, excessive force litigation, discrimination cases, and the representation of both adults

and juveniles involved in the criminal legal system. Their hourly rate is $150.00 until she is admitted.

**OTHER TIMEKEEPERS REFERENCED IN THIS APPLICATION**

145. Ms. Lavern Van Ommerran was a legal assistant/paralegal in our office, having obtained her paralegal certificate from Hofstra University in 2002, and her Bachelor of Science Degree in Political Science from that same institution in 2005.

146. Her work was concentrated in April of 2019. Ms. Van Ommerran worked as a paralegal prior to coming to our office in 2005. She recently retired. Before retiring, she was one of two full-time legal assistants/paralegals in our office for a long time. Her involvement in this case was helpful from initial disclosure until her retirement. With her work, as with other paralegals, we have used our judgment not to bill for such things as file preparation, setting up of meetings, comparing documents and other tasks she preformed. However, Ms. Van Ommerran had regular contact with Plaintiffs, assisted with paper discovery, interfaced with Defendants' Counsel, worked with our expert for the provision of information, helped with document organization and preparation for depositions and court appearances.

147. As the paralegals assigned to work with the attorneys on this case and during trial preparation and trial, Christina Portee and Essence Hightower, who joined our offices respectively in 2024 and 2025, were asked to assist in client contact, file preparation and support for the attorneys. Their attention to the detailed records provided critical assistance to me. Both Ms. Portee and Ms. Hightower interfaced directly with the client to address their needs. They assisted the attorneys on various task necessary to move the case forward to conclusion, much of their time is not included in this application as our billing judgment led to the determination to limit their time

applied for.   We seek an hourly rate of $100 for the work performed by Ms. Van Ommerran, Ms. Portee and Ms. Hightower.  In *Taylor*, *supra*, Magistrate Judge Locke approved of this hourly rate for paralegal work, including work performed by Ms. Van Ommerran.

148.    In this fee application many of the hours that were unnecessary or duplicative have been excluded, such as copying, production of printouts of the billing work sheet, and pulling information on past cases worked on.  Further, when documents being drafted were reviewed by other staff persons, any reviews and  substantive changes which came from the reviews by associates were not billed. The total number of hours I spent on this fee application up until July 31, 2026 is 16.1 hours.  Excluded from the total bill are many hours for paralegal work done during discovery and when an attorney attended a proceeding and had no material impact or task in that proceeding, such as court appearances.

149.    Based on the rates set forth above, and the hours set forth in the schedule attached hereto as "Exhibit 1", I ask that attorney fees be awarded in this matter as follows:

| ATTORNEY/STAFF | HOURS | RATE | AMOUNT(s) |
|---|---|---|---|
| Frederick K. Brewington | 314.50 | $650/hour | $204,425.00 |
| Cobia M. Powell | 4.90 | $250/hour | $   1,225.00 |
| Albert D. Manuel | 4.10 | $300/hour | $   2,230.00 |
| Gregory Calliste | 21.30 | $350/hour | $   7,455.00 |
| Cathryn Harris-Marchesi | 52.80 | $350/hour | $  18,480.00 |
| Dennis Swanson | 2.00 | $200/hour | $      400.00 |
| Precilla Lockett | 20.00 | $150/hour | $   3,000.00 |
| Danielle Speziale | 18.50 | $150/hour | $   2,775.00 |

| | | | | |
|---|---|---|---|---|
| Christina Portee | 3.00 | $100/hour | $ | 300.00 |
| Lavern Van Ommerran | 3.40 | $100/hour | $ | 340.00 |
| Essence Hightower | .30 | $100/hour | $ | 30.00 |

**TOTAL LEGAL FEES CLAIMED (AS OF 7/31/2026): . . . . . . . . .$240,885.00**

150. In addition to the above-referenced attorney's fees, I seek reimbursement of certain necessary costs and disbursements associated with the prosecution of plaintiff's action. The total amount of these necessary costs is **$6,513.53. Law Offices of Frederick K. Brewington, total of fees and costs is $247,398.53.(See Exhibit 1).**

151. As noted, the fees and costs set forth herein do not include any further work that may be necessary on this motion (such as the preparation of the final set of papers filed and a Reply to the defendants' Opposition), in opposing defendants' post-trial motions, or work to be performed by the Law Offices in response to the Court's rulings, including any appeal the parties may take. If warranted, Plaintiffs will supplement their request for fees and costs to reflect all work done on this matter prospectively as of the completion of this Declaration and Memorandum of Law.

Dated: August 3, 2026
Hempstead, New York

FREDERICK K. BREWINGTON

**DOCKET NO.: 15-CV-05598 (GRB)(ARL)**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
ALEXANDER PERROS, THOMAS DELLE,NICHOLAS LENOCI, VICTOR PATALANO, RONALD LANIER and IBRAHIM ZAHRAN Collectively on Behalf of All Persons Similarly Situated and/or Sheriff's DepartmentFormer Personnel Unfairly Denied Proper "Recommendation for Consideration ofApplication for Pistol License for Retiring Peace [Police] Officer" Forms and/or *Good Guy Letters*" Following Retirement, Due to Injury and/or Disability,

Plaintiffs,

-against-

COUNTY OF NASSAU and MICHAEL SPOSATO, in his Individual and Official Capacities,

Defendants.
--------------------------------------------------------------X
DECLARATION OF FREDERICK K. BREWINGTON WITH EXHIBITS
IN SUPPORT OF MOTION FOR
COSTS AND REASONABLE ATTORNEYS' FEES
--------------------------------------------------------------X

**LAW OFFICES OF**
**FREDERICK K. BREWINGTON**
*Attorneys for Plaintiffs*
**556 Peninsula Boulevard**
**Hempstead, New York 11550**
**(516) 489-6959**